UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

KENDRA D. BERNARD,

          Petitioner,

     vs.

DEBORAH K. JOHNSON, Warden,

        Respondent.

Case No:  C 07-1575 SBA (PR)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

      Petitioner Kendra D. Bernard ("Petitioner") brings the instant pro se habeas action under 28 U.S.C. § 2254 to challenge her murder conviction and sentence rendered in the Contra Costa County Superior Court.  Petitioner's Amended Petition is the operative pleading in this action.  Having read and considered the papers filed in connection with this matter and being fully informed, the Court hereby DENIES the Amended Petition for the reasons set forth below.

# I.      BACKGROUND

## A.      STATEMENT OF FACTS

The following facts are taken from the opinion of the California Court of Appeal ("Court of Appeal" or "state appellate court"):

A. *Circumstances Leading up to the Crime*

Sixty-two-year-old Margaret Bernard lived in a condominium in Antioch with her daughter, appellant Kendra Dawn Bernard.[1] Sometimes, Bernard's 18-year-old daughter Larissa Barton also lived with them.[2] Margaret and Bernard did not get along well. They argued frequently[3] and Margaret complained regularly about Bernard. Bernard could get very angry with Margaret but had no history of physical violence toward her mother.

There were several sources of discontent between the two women. Bernard was only occasionally employed doing landscaping, construction and maintenance work. When she was not working, Margaret supported her. Bernard did not pay rent, but did some repair work and improvements at her mother's condominium.

Margaret was also upset with Bernard about the state of their home. Bernard parked her motorcycle in the living room and kept a dog that Margaret did not want there. Bernard wrote graffiti[4] on walls, doors and fixtures, damaging the condominium.[5] Margaret wanted to move, but she feared that Bernard would burn the condominium down.

Bernard's boyfriend Edward Cunningham was also a source of disagreement for mother and daughter. Margaret was afraid of him. She believed that he had committed various acts

---

[1] To avoid confusion, the opinion subsequently refers to the victim as Margaret and the appellant as Bernard.

[2] Larissa moved in with her father two or three weeks before Margaret was killed. She left Margaret's house because Bernard and [Edward] Cunningham [Petitioner's boyfriend] were constantly fighting and Cunningham was "messing up" her car.

[3] Bernard admitted that she and her mother had such a loud argument on April 1, 2001, that a neighbor called the police.

[4] She wrote phrases on the bedroom door that were inspired by a magazine criticizing the government for its gun policies and praising extremists, the Ku Klux Klan and militias. She told the jury that she just wrote this when she was angry and never thought about it again.

[5] She later described this behavior as a way to vent her anger.

of vandalism in and around the condominium.  By early 2001,[6] Margaret made it clear that she did not want Cunningham to come to the condominium, but sometimes he came anyway. Sometimes, Bernard did not want to let him in or talk with him on the telephone, even after he called repeatedly in a short time.

Margaret had asked her son Phil to fix up her condominium, which she decided to sell.  He repaired or replaced doors and walls with holes in them and Bernard's writing on them.  During the weekend before Easter[7]—the weekend of April 7-8—he returned to the condominium and discovered that some of the repairs he had completed had to be redone because of new damage.  Angrily, he kicked in the door of Bernard's bedroom.[8]  He saw that her room was piled high with garbage.  Phil saw a gun inside Bernard's room where a knife stuck out of the door jamb.[9]

### B.  *Missing Person's Investigation*

One of Margaret's neighbors noticed that Bernard's dog was alone at the condominium and contacted authorities.  On April 21, an Antioch police officer went to the condominium to check on the dog's welfare.  He forced his way into the locked condominium and found the dog inside.  It appeared that the dog had been left unattended for several days, although someone had left food for the animal.  The dog was taken by animal control.  Police boarded up the condominium door and left a card on it.

When Margaret did not keep her Easter weekend plans on April 14 and 15 and did not go to work during the week of April 16 to 20, her family became concerned.  Margaret's daughter Kim went to the condominium and found that the police had been there.  Neither Margaret nor Bernard were there.

By April 24, Antioch police had received missing persons reports from Margaret's daughter Kim.  The police returned to the condominium to make a more thorough search of the home.  A maintenance worker for the condominium association told Officer Brown that he had last seen Margaret on the Friday before Easter—April 13.  Margaret had not kept an appointment on Tuesday, April 17.  He thought that he saw Bernard in a maroon Fairmont in front of the condominium on

---

[6] All subsequent dates refer to the 2001 calendar year unless otherwise indicated.

[7] We take judicial notice of the April 2001 calendar, including the fact that April 15 was Easter Sunday.  (See Evid. Code, §§ 452, subd. (h), 459, subd. (a).)

[8] Bernard testified that her brother's version of events was backwards—that he kicked in her door, prompting her to kick a hole in the wall.

[9] Bernard admitted that she owned guns that she kept in her room.

3

Monday, April 16 or Tuesday, April 17.  Antioch police questioned Margaret's son Phil, who characterized Bernard as a psychopath.  At this point, police suspected that Cunningham might also be involved with Margaret's disappearance.[16]

C.  *Sierra County and Solano County Discoveries*

By this time, Antioch police knew that a dismembered body had been found in Northern California, but the identity of the body was not certain.  A few days earlier, on Friday, April 20, a Sierra County sheriff found a nude female torso on a rural road near the town of Alleghany.  The torso was missing its head, hands and feet.  No clothing or identifying indicia was found with the remains.  A sheetrock knife, pieces of fabric and various bits of plastic were found nearby.

On the same day, a Solano County sheriff received a report that a woman's severed head had been seen inside a sleeping bag left on a road beside an orchard near Putah Creek.  At this site, the sheriff found a mound of items 15 to 20 feet from the road.  In the mound, police found a sleeping bag containing a severed head, two hands and two feet wrapped in plastic with some rope, an axe, a machete, two knives, and a sweatshirt.  Teal plastic bags and other pieces of plastic were also found in the mound or in the nearby orchard.  Antioch police believed that Margaret's body was dismembered in order to dispose of evidence of her murder.

D.  *Murder Investigation*

On April 25, Antioch police confirmed Margaret's death.  Bernard was arrested at the San Leandro home of Loren Dale Barton, who was Larissa's father.  Bernard was limping, but had few other obvious injuries.  At the time of her arrest, Bernard's purse had been seized.  It contained pine needles and a granite rock more common to the Sierra Nevada than to the local area.[11]  Receipts dated April 14 and April 16 were also found in her purse.  Two of these receipts were from Antioch and Pittsburg Wal-Mart stores.[12]  One showed that a machete had been purchased on April 16.  The indicated item was akin to a machete found at the Solano County crime scene.  Another April 16 receipt evidenced a visit to an Oakley Albertson's

---

[10] Throughout the investigation, Antioch police conducted various inquiries at the request of Bernard's defense counsel.

[11] The jury had evidence of sample foliage from Sierra County—pine needles, a dried leaf and cedar twigs—that had been collected near where Margaret's torso was found.

[12] One April 16 purchase at a Pittsburg Wal-Mart was paid by Bernard using one of Margaret's checks.  She used Margaret's driver's license as identification for this transaction.

store.[13]

That same day, Modesto police formally notified Margaret's son Phil of the fact—but not the circumstances—of Margaret's death. Spontaneously, he characterized Bernard as having a violent temper. He told police that Bernard had been afraid of Bernard, who had repeatedly threatened her. According to Phil, Margaret wanted Bernard to move out, but was afraid to ask her to do so. Bernard had threatened his sister and himself, too. Phil was sufficiently concerned for his own safety that he planned to leave his home in order to avoid confronting Bernard.

On April 25, the Fairmont had been found parked near Margaret's condominium. Part of its front left grill and the light were missing. The car was impounded. The vehicle was searched two days later, on April 27. A tent, shovel and teal plastic bags were found among a jumble of items in the back seat. The front seat was covered by a cloth. Under the cloth, inked writing[14] was found on the center of the front seat. The writing was covered over with heavy black ink. A marking pen was also found in the car. Teal and black plastic were found in the trunk, along with some pine needles and leaves. Several items in the trunk were stained with what was later determined to be Margaret's blood.

Also on April 27, Antioch police searched Margaret's condominium. They found the living room and bedrooms in disarray. Among the items found were black plastic bags, syringes, a length of rope, and indicia belonging to Bernard and to Cunningham. A purse that appeared to belong to Bernard contained a dagger that had been sharpened on both sides of the blade. In front of the condominium, a garbage can held a plastic bag containing a potholder with a clump of blond hair on it.[15]

The metal front door of the condominium had a small puncture in it, as if someone had pushed a knife through the outer layer. The authorities looked for hardened glue or a broken key in the locks, but found none. Police also observed

---

[13] A surveillance videotape from the time indicated on this receipt showed a man resembling Cunningham at the Oakley store. He appeared to be alone. Bernard's image did not appear on the videotape.

[14] The visible writing on the front seat seemed to be "ELC," "Cunningham" and either "kidnapped" or "chopped." A forensics expert was able to make out the words underneath the obliteration—references to "Angie Bernard"; "my mom"; "ELC"; "He chopped"; "Help Me My Mom"; "Hwy 49"; "Allegan Inn, Nevada City"; and "Edward Lee Cunningham." Another part seemed to read: "Ed made me do myself." There was also two seven-digit numbers that might have been telephone numbers.

[15] According to Margaret's driver's license, she had blond hair.

the initials ELC[16] scratched into the curb in front of the condominium.  In all, the detailed search of the condominium took 14 hours to complete.

Law enforcement officials gradually established forensic links among evidence found at Margaret's condominium, in the Fairmont, and at the Sierra County and Solano County crime scenes.  The various body parts were identified as belonging to Margaret's body.  The sleeping bag, the rope found in the plastic bags with the severed hands and feet, a knife and a bed sheet[17] that were all found in Solano County were tied to Margaret's condominium.  Teal plastic bags found in the Fairmont and at the Sierra County crime scene matched plastic that had been wrapped around the body parts that were found in Solano County.  Foliage that was not natural to the Solano County crime scene was found in the hair on the severed head.[18] The forensics evidence also suggested that Margaret's body had been taken from the condominium to an outdoor location where it had been dismembered using the axe, machete and knives.

The police also began to piece together a chronology of events in the days leading up to Margaret's death and the time of Bernard's arrest.  On Wednesday, April 18, Bernard was trying to locate Barton, Larissa's father.  On Thursday, April 19, Barton went with a friend to Vallejo where they found Bernard asleep in the Fairmont.  She was filthy, crying, and disoriented.  Barton thought that she was on methamphetamine and was sleep-deprived.  She told Barton that the police could be looking for her because Margaret was dead.  When he appeared not to believe that her mother was dead, she said "just smell the trunk."  Bernard was unclear on some of the details of how her mother died, but the way she described the situation led Barton to believe that she woke to find her mother's neck cradled in her arm.  When he returned to his friend, Barton said that Bernard's mother was dead.[19]

Barton went back home to San Leandro and Bernard followed him.  Bernard talked with their daughter Larissa in private and later recounted some details of Margaret's death to

---

[16] These are Cunningham's initials.  Bernard testified that Cunningham admitted to her that he carved them in the curb.  Larissa testified that she saw these same initials marked on the hood of Bernard's car once when Cunningham had come to the condominium and they did not answer his knock, hoping he would go away.

[17] At the Sierra County and Solano County crime scenes, two matching pieces of fabric were found.  They had formed a single bed sheet that had belonged to Margaret.

[18] See footnote [11], ante.

[19] Barton's friend later told police that Barton had told him that Bernard said she had strangled her mother.  Barton later admitted that he had told his friend this, having made this assumption based on what Bernard told him.  However, Barton insisted that Bernard never actually said that she had strangled Margaret.

Barton.  Bernard said that she and Cunningham had been at the condominium drinking.  She was uncertain, but thought that she lost consciousness at some point.[20]  She woke to feel Cunningham nudging her foot.  She was on the kitchen floor with her arm underneath Margaret, whose fingernails were blue, suggesting that Margaret was dead.  Cunningham told Bernard that he had to give her an injection to wake her up; that he was going to help her out of this because he loved her; and that he took photographs.

Bernard said that she and Cunningham put Margaret's body in the Fairmont.  She told Barton that she held onto Margaret's body while Cunningham cut off her head, hands and feet.[21]  She said that she did not want to do this, but he had an axe and turned it on her, making her fear for her own safety if she did not do as he instructed.  Bernard also said that Cunningham cut off one of Margaret's fingers in order to remove a ring.[22]  Bernard also admitted cashing some of Margaret's checks.[23]  She seemed convinced that she had lost control of herself, but did not think that she killed Margaret— she could not be certain.  Bernard seemed to think that Cunningham had set her up for the crime.

Bernard stayed with Barton for almost a week before she was arrested.  She seemed fearful of both her boyfriend and the police.  She slept much of the first two days.  She wanted to flee, but Barton persuaded her to consult the public defender instead.  On April 23 and again on April 24, Bernard went to Martinez with Larissa for this purpose.  On the way to her first meeting with the public defender, Bernard picked up Margaret's second car in Pittsburg[24] and left the Fairmont in Antioch near the condominium.

E.  *Pretrial Procedure*

In October, a five-day preliminary hearing was conducted.  Bernard sought to introduce evidence of

---

[20] Bernard told Barton that she believed that she had been given an injection that caused her to lose consciousness.

[21] Bernard herself testified that Barton was mistaken—that she did not actually see Cunningham dismember Margaret's body.

[22] See footnote [40], post.

[23] The day before Margaret died, Bernard wrote one of Margaret's checks to herself for $213.  Bernard told the jury that her mother allowed her to do this after Margaret contacted her bank for approval.

[24] Bernard later testified that she and Cunningham moved the car to Pittsburg on Monday, April 16, before disposing of Margaret's body so that it would appear that Margaret had gone to work as usual.

1    Cunningham's propensity to violence on various grounds—as a
2    common plan to intimidate or terrorize people, as evidence of
     the identity of Margaret's killer, and to support her own
     credibility.  The trial court ruled that the evidence was
3    inadmissible.  (See Evid. Code,[25] § 1101.)  Bernard was held to
     answer on the murder charge.

4            In December, Bernard was charged by information with
5    first degree murder.  (See Pen. Code, § 187.)  Her motion to set
     aside the information—again, grounded in her claim that
6    Cunningham was the real murderer—was denied in January
     2002.  (See Pen. Code, § 995.)  Her motions to exclude her
7    pretrial statement as involuntary and to compel specific
     performance of an agreement entitling her to take a polygraph
8    test in order to establish her innocence[26] were also denied.

9            In March 2002, Bernard filed a motion in limine to admit
     evidence of 30 separate incidents of Cunningham's prior
10   uncharged violent conduct—evidence that she reasoned would
     tend to prove that he had killed Margaret.  After hearing, the
11   trial court granted the request to admit evidence of nine of these
     incidents—those involving Bernard herself—but refused to
12   admit evidence of the other 21 incidents—those involving third
     parties.  In so doing, it reasoned that any Cunningham incidents
13   involving Bernard, her mother or their home were relevant to
     explain Bernard's state of mind before and after the murder.
14   This state of mind evidence was thought to be relevant to
     Bernard's defense that Cunningham actually killed Margaret—
15   that she did not kill her mother but merely accompanied him
     and helped to dispose of her mother's body.  The trial court
16   found that the incidents involving third parties were
     inadmissible and were excludable on the ground that they were

17

18

19

20

21

22

23   _____
     [25] All subsequent statutory references are to the Evidence Code unless otherwise
24   indicated.

25   [26] Bernard gave a statement to prosecutors and took a polygraph test, to further the
     public defender's suggestion that she testify for the prosecution against Cunningham.  She
26   passed a polygraph test, but prosecutors wanted her to take a second one.  Before Bernard
     could take the second polygraph test, the prosecution decided to prosecute Bernard instead.
27   Afterward, defense counsel argued—without success—that Bernard was entitled to specific
     performance of an agreement entitling her to take a second polygraph test.  He did not
28   argue that Bernard was entitled to have the case against her dismissed.

more prejudicial than probative.[27]  (See § 352.)  The parties were also barred from referring to Cunningham's anticipated exercise of his privilege against self-incrimination before the jury.[28]

### F. *Trial and Sentencing*

#### 1. *The Prosecution's Evidence*

At the hearing on the motion in limine, Bernard argued that Cunningham's prior violence made him a more likely killer than she was, making the proffered evidence relevant.  Even if the evidence was not admissible under section 1101, she reasoned that due process considerations compelled that this evidence be admitted in order to allow her to defend against the murder charge.  The prosecution argued that due process did not make otherwise inadmissible propensity evidence admissible.

Trial began in mid-March 2002.  Throughout the trial, Bernard asserted that only two people could have committed the murder.  She contended that she was innocent and that Cunningham had killed her mother.  Her own actions after Margaret was killed were done under duress, she argued, making evidence of her fear of Cunningham relevant and admissible.  The prosecutor reasoned that this defense was inconsistent with Bernard's initial belief that she had killed her mother.  The jury saw and heard a part of a taped statement in which Bernard said that initially, she thought she had killed her mother and acted in the days immediately after Margaret's death to cover up her apparent crime.  During trial, the prosecution and the defense made repeated attempts to persuade

---

[27] We have already determined a related petition in this case.  In March 2002, Bernard petitioned this court for a writ of mandate or prohibition, challenging inter alia the constitutionality of the trial court's denial of her motion in limine to admit evidence of Cunningham's uncharged offenses committed against third parties.  She also sought a stay of the trial soon after jury selection had been completed.  (Bernard v. Superior Court, A098036.)  We denied both the request for stay and the petition for an extraordinary writ.  Our summary denial of Bernard's petition for a writ of mandate is not res judicata on the questions presented in this appeal.  (See People v. Medina (1972) 6 Cal. 3d 484, 491, fn. 6, disapproved on other grounds in Kowis v. Howard (1992) 3 Cal. 4th 888, 899; People v. Venghiattis (1986) 185 Cal. App. 3d 326, 329, fn. 3.)  Thus, we address the merits of these issues on appeal, despite the fact that many of them were raised in the petition for extraordinary writ.

[28] Outside the presence of the jury, the trial court heard that Cunningham was not under arrest nor had he been charged with Margaret Bernard's murder.  Apparently, he was jailed for six months on a parole or probation violation and was not released until November 2001.  The November 2004 presentence report stated that Cunningham had not been arrested for Margaret Bernard's murder.  The jury heard hearsay evidence that Cunningham had been interrogated about the crime, but not arrested for it.  (See also fn. [40], post.)

the trial court to expand or contract its ruling on the admissibility of evidence of Cunningham's uncharged conduct, without success.

The prosecution established that Margaret died by strangulation. Her head showed evidence of blunt force applied to it—the result of either a blow or a fall. Her other injuries—including a broken jaw and a broken ankle—also suggested that Margaret struggled before she died. However, the lack of bruises on her neck suggested two possible scenarios—either that Margaret lost consciousness and stopped struggling before she was strangled or that she was strangled with an arm rather than with someone's hands. A forensic pathologist opined that Margaret fell or hit her head, causing her to lose consciousness before she was strangled. Margaret died sometime after she was last seen alive on April 13 and before her body was found on April 20. Authorities could not determine the exact date and time of death from the physical evidence in this case.

Outside the presence of the jury, Cunningham was called by the defense and questioned about his part in Margaret's death. He declined to answer these questions, asserting his privilege against self-incrimination. (See U.S. Const., 5th Amend.) He came into court in the presence of the jury and stood beside Bernard for the panel to view him.

A rancher and his partner who lived in Sierra County near Alleghany Ridge Road testified that late one night in mid-April, a strange man and woman appeared at their rural home, saying that they had run out of gas. The two visitors seemed to be high on drugs. The rancher and the man went to siphon some gas into a can while the woman returned to their car to get money to pay for the gas. She was gone for no more than five minutes. Walking back from the car, the woman fell into a creek, injuring her leg. The strange man helped the woman out of the creek; in the process, he fell into the creek, too. The woman did not seem to be afraid of the man she was with. The ranch offered many places for concealment, but she made no attempt to flee. She did not ask for help or indicate in any way that she was being held against her will.

A day or two later, the rancher learned that a torso had been dumped less than 20 miles from his ranch. Hearing this, he wondered if the night visitors were involved in this incident and he called the local sheriff about it. He and his partner later identified Bernard and/or Cunningham from photographic lineups, but the identifications were not particularly solid.

### 2. *Cunningham's Alibi*

Evidence was offered tending to demonstrate that Cunningham had an alibi for the hours when Bernard had told police that he was with her immediately before Margaret died.[29]

---

[29] See part I.F.1., ante.

10

Annette Hardcastle[30] testified that Cunningham was at her home on Friday and Saturday, April 13 and 14, trying to fix her car.  On the afternoon of Saturday, April 14, he made two telephone calls to Bernard from Hardcastle's house—one lasting about five minutes and another lasting at least an hour.  The second call was made about 5:00 p.m.  After the second call, Cunningham told Hardcastle that Bernard was fighting with Margaret.

Cunningham asked Bernard to come over to Hardcastle's house.  He left about 6:30—approximately an hour and a half after the second telephone call.  Cunningham was upset because Hardcastle did not have money that he asked her to give him.  She expected that Cunningham would return the following day when she offered to pay him, but he did not return on Sunday, April 15.  Later that evening, Hardcastle discovered her car's license plates had been removed and left near her house.  She noted one of the telephone calls to Bernard and the incident involving her license plates[31] on her April 14 calendar.  She also noted on her April 15 calendar that Cunningham did not return as she had expected.

Hardcastle told the jury that Cunningham returned to see her a day or two later.  On April 18, her calendar noted that she saw Cunningham on the news about Bernard being arrested for killing Margaret.  Hardcastle was questioned about how this event could have occurred on April 18, when Bernard was not—in fact—arrested until a week later on April 25.  She told the jury that she might have gotten the April 18 date wrong, but denied that Cunningham had asked her to give him an alibi.  She had been sought out by police, Hardcastle told the jury— she denied seeking out law enforcement officials to offer Cunningham an alibi.

### 3. *The Defense Case*

At the close of the People's case-in-chief, the trial court denied Bernard's motion for acquittal.  (See Pen. Code, § 1118.1.)  Bernard put on numerous witnesses who testified in her defense.  Many witnesses who testified that they had known Bernard for many years also told the jury that they did not think that she was capable of murdering Margaret.[32]  Bernard also tried to establish that Cunningham struck her, rendering her unconscious during the time when Margaret was killed.  She offered evidence of a head injury suffered at that time.  The prosecution countered with evidence that at the relevant times,

---

[30] In fact, Bernard called Hardcastle as a witness for the defense.

[31] This event may actually have been noted on Hardcastle's April 15 calendar.

[32] There was contrary evidence that Bernard sometimes used extreme methods to control a willful teenage daughter.  Several witnesses testified that Bernard was capable of violence.

Bernard did not have cuts or bruises that would have been expected if she had been struck on the forehead or temple hard enough to be rendered unconscious.

Bernard also put on evidence that she feared Cunningham and that this fear was reasonable. There was evidence from several witnesses that in the early part of 2001, Cunningham had threatened Bernard, that he frightened her and that she sometimes slept in her car to avoid him. She had been too afraid to leave her car to go to the bathroom, urinating in her pants instead. After she stayed overnight at the home of a male friend, someone slashed two tires on his car. There was evidence that someone had damaged her car, too, raising the specter that Cunningham had retaliated against her. Friends advised Bernard to get a restraining order against Cunningham.

On January 26, Bernard actually pressed charges against Cunningham. He punched his fist through Bernard's car window while she was locked inside, cutting her face with the broken glass. Bernard's car was later found with a smashed driver's side window.

A defense expert testified about his research involving cases of children who kill their parents. He testified that only about 20 of the estimated 20,000 homicides in the United States each year were killings of mothers by daughters. The expert witness—who was not a statistician—admitted that he was not qualified to offer an opinion about the statistical probabilities of any particular person committing murder.

4. *Bernard's Testimony*

Bernard testified in her own defense, offering her explanation of the events surrounding Margaret's death. In the summer of 2000, Bernard and Cunningham had begun an intimate relationship. Both of them were using methamphetamine. By December 2000 or early in the new year, the relationship became troubled. On January 26, Bernard's face was cut as Cunningham punched his fist through Bernard's car window. Cunningham harassed Bernard on the telephone or standing outside the door of the condominium.

Bernard testified that even though she thought she did not want to see Cunningham again, she did continue to be involved with him. During this time, Cunningham was sometimes loving one minute and angry the next. Bernard called the police several times to report things he did around the condominium. In one incident, Cunningham pounded on her front door seeking entry. While she stood inside the metal door, he stabbed a knife all the way through it. The blade protruded through the door into the house about where Bernard stood. On February 5, he forced his way into the condominium and ripped telephone cords out while Bernard was making a call. On a third occasion, the electrical power and telephone lines were cut after Bernard refused to answer the door to him.

Rather than stay at home alone, Bernard would sometimes go to a friend's house. Cunningham had threatened to burn any unfamiliar car that he saw near the condominium, apparently suspecting that Bernard was seeing someone else. When she got a new car in late January or early February, Bernard slept in it several times with her dog, hoping to catch Cunningham before he set fire to it. Bernard believed that on several occasions Cunningham put glue into the condominium's door locks. Once, a key had been broken off in the lock.

Cunningham did other things that made Bernard uneasy. One night, Cunningham explained that he knew how to cut up bodies with a chainsaw. Bernard took this as a threat. Another night, after Cunningham had made repeated calls to the condominium, Margaret came home and answered the telephone. She told Bernard that Cunningham had said "You three bitches are dead." After she received this threat, Bernard said that Margaret wanted to sell the condominium so that they could move.

Bernard only saw Cunningham twice from mid-March until the day when her mother was killed. During this time, Bernard was using methamphetamine three or four times in some weeks, sometimes with Cunningham, sometimes on her own. She told the jury that she still feared Cunningham, whom she claimed was terrorizing her.

Bernard told the jury that on Friday, April 13, her relationship with Cunningham reached a breaking point. Cunningham came to the condominium while Margaret was away and Bernard let him in. She told him that if he really loved her, he would leave her alone. After almost an hour, Bernard had had enough. She began yelling at him, telling Cunningham that she could not stand the sight of him. Bernard told him to get out and not to come back—to take his "little dick" away. She loudly disparaged the quality of their sex life and his manhood. Cunningham left quietly. Soon, Bernard also left, staying out all night on Sherman Island with a man with whom she used drugs.

The next day—Saturday, April 14—Cunningham called the condominium several times. Bernard used methamphetamine and quarreled with Margaret, who wanted her to clean up the condominium. The argument escalated until Margaret threatened to call the police. Early in the afternoon, Margaret left.

In the late afternoon, Cunningham came over while Margaret was out. He brought Yukon Jack whiskey. He was not angry and Bernard wanted a drink, so she let him in. The two of them began drinking, apparently consuming two pints of whisky between them.

When Bernard saw Margaret approach the condominium, she told Cunningham to leave in order to avoid a confrontation. Bernard testified that he had left by the back

door before, but this time he did not leave.  She told the jury that she was not really bothered by any potential confrontation with Margaret.  In retrospect, Bernard suspected that the alcohol and drugs dulled her emotions.  When Margaret came in and saw Cunningham, she screamed "What the hell are you doing in my house?"  Margaret commanded him to leave.

At the same time, Margaret was arguing with Bernard, blaming her for letting Cunningham into the condominium.  Bernard followed Margaret into the kitchen, saying that they were about to leave.  However, Bernard was not able to walk or talk very well.  Bernard saw Cunningham off to one side, saw something come at her head from the right, and then saw a flash of white light.

The next thing that Bernard could remember, she was on the kitchen floor with Margaret lying beside her.  Her arm was under Margaret's shoulders.  Cunningham was kicking her, saying "Look what you did . . . . [Y]ou can't control your temper."  Seeing that her mother's fingernails were blue, Bernard assumed that Margaret was dead.[33]  She was uncertain what had happened, but assumed that she had killed Margaret.

Bernard had difficulty getting up off the floor, as if she was hung over.  Her pants were unzipped and unbuttoned.  She heard Cunningham laughing, saying that he took pictures.  A camera sat on the table.[34]  Cunningham told Bernard that he had sodomized her and that she had enjoyed it.  He held a syringe with a plastic cover on it.  Still laughing, Cunningham said that he gave her an injection to wake her up.

Sobbing, Bernard made her way to the living room, where she fell on the floor.  She did not know how long she lay there listening as Cunningham ransacked the house.  When he returned to the living room, he told her that he had given her another injection to wake her up.  He told Bernard not to worry—that he intended to help her—but he did not explain his plans to her.

Cunningham asked Bernard to help him remove Margaret's clothing.  She did so, then watched him wrap her mother's body in plastic.  Cunningham put Margaret's body under a bed after Bernard refused to help him with this.

That night, after dark, Bernard and Cunningham left together in the Fairmont.  They stayed overnight at a friend's home.  Neither Cunningham nor Bernard seemed to have slept much that night.  She continued drinking.  She watched as Cunningham put plastic bags into the car trunk.  Bernard did

---

[33] Margaret's fingernails were not blue when an autopsy was conducted.

[34] Bernard testified that she knew it did not have film in it, but forgot this detail.  She never saw any photographs, nor did she ask him to see those that Cunningham told her that he took.

not ask Cunningham for any details about how her mother died.

The next morning—Easter Sunday, April 15—Bernard drove the Fairmont to a store and Cunningham bought alcohol. She dropped him back at the friend's home and returned to the condominium by herself. Cunningham had told her to go there, cautioning her not to answer the telephone or the door. He intended to come over a few hours later. Bernard did not see it, but she knew that Margaret's nude body was still where they had left it. Bernard sat all day and did nothing.

After dark on the evening of Sunday, April 15, Cunningham reappeared at the condominium. He brought drugs with him and Bernard took some. When the drugs ran out, Bernard drove Cunningham to get more, which they used later that night back at the condominium. Cunningham told Bernard that he intended to bury Margaret's body the following day. She found a tent and a shovel to take with them and they provided for her dog, which she would leave at the condominium while they were gone. Bernard could not sleep again that night.

On Monday, April 16, Margaret's body was still at the condominium. Cunningham placed it in a sleeping bag and dragged it out to the living room. He told Bernard that he kicked Margaret's body in the head twice because she pissed him off. He said that he had kicked it hard—that he probably kicked a hole in her head. Cunningham took Bernard's mountain bike and slammed it onto Margaret's body as hard as he could. Then, he jumped up and down on the body several times, calling her a "fucking bitch," saying that he hated her guts, and complaining that she was heavy. Bernard was frightened by this behavior.

In the morning, Cunningham moved the Fairmont closer to the condominium door. Bernard helped him put the sleeping bag containing Margaret's body into the car trunk after the local children had gone to school. Cunningham had her drive the car, but told Bernard to pull over after she drove a short distance. He put the car in park mode, set the brake, pulled her key ring out of the ignition, removed the trunk key and returned the rest of the keys to Bernard. He told her to act as if they did not have a trunk key.

Bernard drove to two Wal-Mart stores, where she forged some of Margaret's checks using her mother's driver's license as identification. At Cunningham's order, she purchased small, expensive items that she could return later for cash. The couple also visited an Albertson's grocery store, where Cunningham bought potato salad and whiskey. Several times, she had opportunities to escape or seek help, but she did not do so. Bernard told the jury that she could not drive away because Cunningham kept the car keys.

That night, she and Cunningham camped at Sherman Island. Bernard was still having difficulty standing and

15

1

2

3

walking.  She told the jury that she almost fell into the campfire as she cooked their dinner.[35]  Bernard testified that she did not drink or use drugs that night.  By this time, she realized that she had a bump on her head and that she was not thinking clearly.  Cunningham gave her something to drink and she finally fell asleep.

4

5

6

7

8

9

10

The next morning—Tuesday, April 17—Bernard had a hard time waking up.  Before leaving Sherman Island, she watched Cunningham burn bags of Margaret's clothing that had been in the car trunk.  Cunningham wanted to go up to a gold mining area in Alleghany.  Bernard drove the two of them up toward Lodi.  After stopping to get gas, Cunningham went into a Wal-Mart[36] and came out with a machete.  Bernard asked what he intended to do with it, but he was silent.  She asked if he was going to kill her, but Cunningham did not respond.  At one point, Cunningham left Bernard alone for over an hour, but she did not try to escape or seek help.  Together, they headed up into the mountains, arriving in Alleghany that night.

11

12

13

Stopping the car after dark, Cunningham pulled Bernard out of the car.  She was on her knees, unable to stand.  He ordered her to open a plastic bag and then threw something at her.  The object hit her and landed on the ground.  When Bernard picked it up, she saw that it was a hand.

14

15

16

17

18

Bernard dropped the hand and fled into the car.  Suddenly, she was unable to see or breathe.  Yelling, Cunningham pulled her out of the car on the passenger side by her hair or her head.  She ripped at a plastic bag that she discovered was over her head, but it then became wrapped around her neck.  On her knees again, Bernard saw Cunningham come up behind her holding an axe over her head.  He told her to open up a bag and forced her to look at a foot.  A second foot landed on her.  Cunningham called her a "fucking bitch" and told her to open the bag.

19

20

21

22

Bernard was terrified, believing that Cunningham was going to kill her.  He wanted a knife, so she returned to the car to look for one.  As she handed him a pair of scissors, she saw Margaret's headless body, which Cunningham apparently kicked down the hill.  Bernard told the jury that Cunningham dismembered Margaret's body—she did not actually see him do it, nor did she do it herself.

23

24

Cunningham drove away with Bernard in the car.  He was driving like a maniac, sideswiping a guardrail as the car

25

26

[35] In an apparent inconsistency, Bernard later suggested that she did not cook dinner that night, but that they ate the prepared potato salad that Cunningham had purchased earlier.

27

28

[36] Bernard's testimony was somewhat confusing about where Cunningham bought the machete—it may have been in a Pittsburg Wal-Mart or a similar store in the Sacramento area.  She was also uncertain whether the machete was purchased on April 16 or April 17.

almost went off the road.  At Cunningham's instruction, Bernard took off the bag that was around her neck and she threw it out the window of the moving car.  They rode on until the car ran out of gas.

Bernard recounted their stop at the rancher's home to ask for gas.  She testified that she was frightened that Cunningham would kill her, but she did not seek any help or seek to escape, even when she returned to the car to get gas money.  Bernard told the jury that while she was at the car, she found a pen, wrote on the seat.  She covered the writing with some clothing, found some money in the car and walked back toward the house.  Along the way, she fell into some water and was completely soaked, hurting her ankle in the process.  She told the jury that Cunningham helped her out, calling her a "stupid bitch" as he did.  He was about to hit her when the rancher reappeared.  Cunningham left Bernard and the rancher alone while he went to put the gas in the car.  Bernard spoke with the rancher, but she was too afraid to ask him for help.  Cunningham returned in the car, picked up Bernard and the two of them set off again.

The car ran out of gas again near a freeway in Auburn or Placerville while it was still dark.  Cunningham got out of the car, screaming at Bernard that he hated her.  He left her in the car for hours with the car keys.  She was unable to start the car or to walk.  Bernard continued writing on the seat of the car, writing that he had "chopped up my mom," going over the words she had written again and again.  She covered the seat with a blanket before he returned.

When Cunningham returned to the car, they waited until it got light out on Wednesday, April 18.  He walked a few blocks away to get more gas.  Bernard followed him briefly, but could not continue walking on her ankle.  She was scared of Cunningham and frightened not to be with him, too.  When he returned to the car, he discovered the writing on the car seat.  Cunningham was angry, so Bernard used mascara to obscure the writing.

They drove off again until they almost ran out of gas in Roseville or Sacramento.  Cunningham stopped at a Wal-Mart store where he returned merchandise for cash that he then used to buy gasoline and alcohol.  He left Bernard in the car, but again, she did not try to escape or get help.  Bernard testified that Cunningham also purchased a 50- or 60-pound bag of cement and a bucket, which he placed on the front seat between them, covering her writing.  He told her that he was headed for a place where he would find water.  Cunningham did not tell her what he planned to do with this cement, but Bernard was scared that he meant her harm.

After a nap, Bernard woke as Cunningham pulled the Fairmont up to a fruit stand.  He left her in the car by herself with the car keys, so Bernard scooted over to the driver's seat and quickly drove away.  Driving along, she recalled how they

had heard something rolling around in the trunk, prompting Cunningham to laugh and say "I hope it ain't her head."  About 10 miles away from the fruit stand, Bernard stopped the car by an orchard and looked in the truck.  Margaret's head was lying inside.  Bernard emptied the trunk of its contents, including the head.

Bernard guessed that she was so intoxicated that she was numb at this time.  She told the jury that she started driving away from the orchard, using her sore foot to propel the car.  She almost crashed into a tree when she kicked the 50- or 60-pound bag of cement out of the passenger door of the car with her right foot.[37]  She also threw the bucket out.  After driving to a more urban area, Bernard stopped the car, parked in a Vallejo shopping center parking lot and called for help.  She finally reached Barton, who met her in Vallejo.

At trial, Bernard repeatedly denied killing Margaret—at least, she stated that she believed that she had not killed her mother.  She told the jury that originally, she believed that she had killed her mother, because Cunningham had convinced her of this.  She thought that he had taken photographs of her killing Margaret with which he intended to blackmail her.  Bernard denied having any difficulty keeping her temper under control,[38] even when using methamphetamine.[39]

Bernard admitted that at the time that Margaret died, she was intoxicated from alcohol and drugs.  The use of alcohol and drugs resulted in slowed reflexes, poor judgment, a loss of perception, and a decreased ability to think or reason clearly.  During the days between Margaret's death and her escape from Cunningham, Bernard did not have her wits about her.  When she spoke with Larissa after meeting up with Barton, she made her first coherent attempt to set out what had happened.  At that point, she first realized that Cunningham hit her.  She began to suspect that she did not kill her mother, but that Cunningham had done so after causing Bernard to lose consciousness.[40]  She

---

[37] The prosecutor later challenged Bernard's credibility by arguing that disposal of the cement in this manner was physically impossible for someone who had suffered a broken ankle.

[38] During closing argument, the prosecutor suggested that the jury saw Bernard lose her temper repeatedly while she was in court.

[39] An expert witness disagreed, testifying that methamphetamine gives the user a sense of great strength.  The use of methamphetamine over several days makes the user likely to be more enraged or violent, especially as the drug is wearing off.  A user who has aggressive tendencies when not using methamphetamine would likely find those tendencies enhanced during drug use.

[40] One witness testified that Cunningham told her that he cut off her finger for a ring.  He said that he spent the night when the body was under the bed, but that he had not known that at the time.  The witness reported this conversation to police shortly before trial began.  No fingers appear to have been cut off of Margaret's hands.

18

did not contact the police with her suspicions.

People v. Bernard, No. A107794, 2006 WL 449017, *1-12 (Cal. Ct. App. Feb. 24, 2006) (footnotes renumbered and brackets added).

**B.    CASE HISTORY**

**1.    Conviction and Sentencing**

Petitioner's case was tried before a jury in the Contra Costa County Superior Court. She was represented by trial attorney William W. Veale.  On April 10, 2002, the jury found Petitioner guilty of first degree premeditated murder, Cal. Penal Code § 187(a).  CT 920. Petitioner was sentenced to an indeterminate term of twenty-five years to life in state prison.  CT 1179A.  On direct appeal, the California Court of Appeal affirmed the judgment in an unpublished opinion issued on February 24, 2006.  Bernard, 2006 WL 449017, *17; Resp't Ex. F.  The California Supreme Court subsequently denied review.  Resp't  Exs. G, H.

**2.    Federal Court Proceedings**

On June 28, 2007, Petitioner filed a form Petition for Writ of Habeas Corpus in this Court, which raised the claims set forth in her then pending state habeas petition.  Dkt. 19. The Court stayed the federal petition to allow Petitioner to exhaust her claims in state court. Dkt. 31.  On May 13, 2008, the California Supreme Court issued a summary denial of Petitioner's habeas petition.  Resp't Exs. I, J.  On December 10, 2009, Petitioner informed this Court that she had exhausted state remedies.  Dkt. 45.  The Court, in turn, directed Petitioner to file an amended petition which included her newly-exhausted claims.  Dkt. 48.

On March 10, 2010, Petitioner filed her Amended Petition, again utilizing the Court's form for habeas petitions.  Dkt. 51.  The Amended Petition incorporates by

1   reference the 145-page habeas petition which she filed in the California Supreme Court.[41]

2   Pursuant to the Court's Order to Show Cause, Dkt. 61, Respondent has filed an Answer to

3   the Amended Petition, and Petitioner has filed a Traverse.[42]   Dkts. 69, 74, 75.  The matter is

4   fully briefed and ripe for adjudication.

5   **II.   <u>LEGAL STANDARD</u>**

6   A petition for a writ of habeas corpus is governed by the Antiterrorism and Effective

7   Death Penalty Act of 1996 ("AEDPA").  The Court may entertain such a writ petition "in

8   behalf of a person in custody pursuant to the judgment of a State court only on the ground

9   that he is in custody in violation of the Constitution or laws or treaties of the United States."

10   28 U.S.C. § 2254(a).  A district court may not grant a petition challenging a state conviction

11   on the basis of a claim that was reviewed on the merits in state court unless the state court's

12   adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an

13   unreasonable application of, clearly established Federal law, as determined by the Supreme

14   Court of the United States, 28 U.S.C. § 2254(d)(1); or (2) resulted in a decision that was

15

16

_____

17   [41] Although Petitioner did not attach a copy of the state petition to her Amended
18   Petition, a disorganized and jumbled version of that petition, along with the supporting
     exhibits, were appended to the original federal Petition.  <u>See</u> Dkts. 19-2, 19-3.
19   Respondent's Answer includes a complete and organized copy of Petitioner's state habeas
     petition, to which Court will refer when citing to Petitioner's claims.  <u>See</u> Resp't Ex. I.
20   However, Respondent's copy of the state petition does not include the supporting exhibits;
     therefore, the Court will refer to the exhibits submitted by Petitioner in support of her
21   original Petition.  <u>See</u> Dkts. 19-4 through 19-14.

22   [42] Petitioner's "Traverse" is largely a verbatim handwritten copy of the "Facts"
     section from the opinion of the Court of Appeal, along with a few attachments, including
23   Petitioner's picture, a copy of the results from the first polygraph examination, and a two-
     page letter requesting pro bono representation.  Dkt. 74.  Petitioner's "Points and
24   Authorities in Support of the Traverse" contains summaries of the same claims and
     arguments as those in her state habeas petition.  Dkt. 75.  Because Petitioner's traverse
25   mirrors previously-filed documents and contains no new arguments in support of her
     claims, the Court will cite only to the complete claims and arguments outlined in the state
26   habeas petition.  <u>See</u> Resp't Ex. I.  As for her request for counsel, the Court, in its
     discretion, finds that the appointment of counsel is not warranted in this case.  <u>See</u>
27   <u>Knaubert v. Goldsmith</u>, 791 F.2d 722, 728 (9th Cir. 1986) (standard for appointing counsel
     in habeas cases).
28

1  based on an unreasonable determination of the facts in light of the evidence presented in the

2  State court proceeding," id. § 2254(d)(2).

3      **A.**    **28 U.S.C. § 2254(D)(1)**

4       To determine whether a state court ruling was "contrary to" or involved an

5  "unreasonable application" of federal law under subsection (d)(1), the Court must first

6  identify the "clearly established Federal law," if any, that governs the sufficiency of the

7  claims on habeas review. "Clearly established" federal law consists of the holdings of the

8  United States Supreme Court which existed at the time the petitioner's state court

9  conviction became final.  Williams v. Taylor, 529 U.S. 362, 412 (2000); Richter, 562 U.S.

10  at 102.  A state court decision is "contrary to" clearly established Supreme Court precedent

11  if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's]

12  cases," or if it "confronts a set of facts that are materially indistinguishable from a decision

13  of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent."

14  Williams, 529 U.S. at 405-406. "Under the 'unreasonable application' clause, a federal

15  habeas court may grant the writ if the state court identifies the correct governing legal

16  principle from [the Supreme] Court's decisions but unreasonably applies that principle to

17  the facts of the prisoner's case."  Id. at 413.  "[A] federal habeas court may not issue the

18  writ simply because that court concludes in its independent judgment that the relevant state-

19  court decision applied clearly established federal law erroneously or incorrectly.  Rather,

20  that application must also be unreasonable."  Id. at 411.

21       On federal habeas review, AEDPA "imposes a highly deferential standard for

22  evaluating state-court rulings" and "demands that state-court decisions be given the benefit

23  of the doubt."  Renico v. Lett, 559 U.S. 766, 773 (2010) (internal quotation marks omitted).

24  In applying the above standards on habeas review, this Court reviews the "last reasoned

25  decision" by the state court.  See Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).

26  Where the state court reaches a decision on the merits but provides no reasoning to support

27  its conclusion, a federal habeas court independently reviews the record to determine

28  whether habeas corpus relief is available under § 2254(d). Stanley v. Cullen, 633 F.3d 852,

860 (9th Cir. 2011).  Here, Petitioner presented all the federal claims in her Amended

Petition to the California Supreme Court in a state habeas petition, which the California

Supreme Court summarily denied.  See Resp't Exs. I, J.  As such, these claims may be

reviewed independently by this Court to determine whether that decision was an objectively

unreasonable application of clearly established federal law.  Plascencia v. Alameida, 467

F.3d 1190, 1197-98 (9th Cir. 2006) ("Because there is no reasoned state court decision

denying this claim, we 'perform an independent review of the record to ascertain whether

the state court decision was objectively unreasonable.'") (citation omitted); see Himes v.

Thompson, 336 F.3d 848, 853 (9th Cir. 2003) ("Independent review of the record is not de

novo review of the constitutional issue, but rather, the only method by which we can

determine whether a silent state court decision is objectively unreasonable.").  "[W]here a

state court's decision is unaccompanied by an explanation, the habeas petitioner's burden

still must be met by showing there was no reasonable basis for the state court to deny

relief."  Harrington v. Richter, 562 U.S. 86, 98 (2011).

### B.    28 U.S.C. § 2254(D)(2) AND (E)(1)

A federal habeas court may grant a writ if it concludes a state court's adjudication of

a claim "resulted in a decision that was based on an unreasonable determination of the facts

in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).

An unreasonable determination of the facts occurs where a state court fails to consider and

weigh highly probative, relevant evidence, central to a petitioner's claim, that was properly

presented and made part of the state court record.  Taylor v. Maddox, 366 F.3d 992, 1005

(9th Cir. 2004).  A district court must presume correct any determination of a factual issue

made by a state court unless a petitioner rebuts the presumption of correctness by clear and

convincing evidence.  28 U.S.C. § 2254(e)(1).  The presumption of correctness applies to

express and implied findings of fact by both trial and appellate courts.  Sumner v. Mata,

449 U.S. 539, 546-47 (1981); see Williams v. Rhoades, 354 F.3d 1101, 1108 (9th Cir.

2004) ("On habeas review, state appellate court findings—including those that interpret

1  unclear or ambiguous trial court ruling—are entitled to the same presumption of correctness

2  that we afford trial court findings.").

3  Section 2254(d)(2) applies to an intrinsic review of a state court's fact-finding

4  process, or situations in which the petitioner challenges a state court's fact-findings based

5  entirely on the state court record, whereas § 2254(e)(1) applies to challenges based on

6  extrinsic evidence, or evidence presented for the first time in federal court.  See Taylor, 366

7  F.3d at 999-1000.  In Taylor, the Ninth Circuit established a two-part analysis under

8  §§ 2254(d)(2) and 2254(e)(1).  Id.  First, federal courts must undertake an "intrinsic

9  review" of a state court's fact-finding process under the "unreasonable determination"

10  clause of § 2254(d)(2).  Id. at 1000.  The intrinsic review requires federal courts to examine

11  the state court's fact-finding process, not its findings.  Id.  Once a state court's fact-finding

12  process survives this intrinsic review, the second part of the analysis begins by addressing

13  the state court finding of a presumption of correctness under § 2254(e)(1).  Id.  According

14  to the AEDPA, this presumption means that the state court's fact-finding may be

15  overturned based on new evidence presented by a petitioner for the first time in federal

16  court only if such new evidence amounts to clear and convincing proof a state court finding

17  is in error.  See 28 U.S.C. § 2254(e)(1).  "Significantly, the presumption of correctness and

18  the clear-and-convincing standard of proof only come into play once the state court's fact-

19  findings survive any intrinsic challenge; they do not apply to a challenge that is governed

20  by the deference implicit in the 'unreasonable determination' standard of section

21  2254(d)(2)."  Taylor, 366 F.3d at 1000.

22  If constitutional error is found, habeas relief is warranted only if the error had a

23  "substantial and injurious effect or influence in determining the jury's verdict."  Penry v.

24  Johnson, 532 U.S. 782, 795 (2001) (quoting Brecht v. Abrahamson, 507 U.S. 619, 638

25  (1993)).

26  **III.   DISCUSSION**

27  Petitioner asserts the following claims, which include numerous sub-claims:

28  (1) ineffective assistance of counsel ("IAC"); (2) judicial misconduct; (3) prosecutorial

1  misconduct; and (4) juror misconduct.  <u>See</u> Resp't Ex. I at 20-138.[43]  These claims are

2  addressed seriatim.

3      **A.  IAC CLAIMS**

4       Petitioner first raises multiple IAC claims as to her trial counsel, William W. Veale,

5  and appellate counsel, Victor J. Morse.  <u>Id.</u> at 20-80.  The clearly established federal law

6  governing IAC claims is set forth in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).  Under

7  <u>Strickland,</u> a defendant must show that (1) counsel's performance was deficient and that

8  (2) the "deficient performance prejudiced the defense."  <u>Id.</u> at 687.  Counsel is

9  constitutionally deficient if his or her representation "fell below an objective standard of

10  reasonableness" such that it was outside "the range of competence demanded of attorneys

11  in criminal cases."  <u>Id.</u> at 687-88 (internal quotation marks omitted).  Reviewing courts

12  must "indulge a strong presumption that counsel's conduct falls within the wide range of

13  reasonable professional assistance."  <u>Id.</u> at 689.  Where deficient performance is

14  established, "[the] errors must be 'so serious as to deprive the defendant of a fair trial, a

15  trial whose result is reliable.'"  <u>Harrington</u>, 562 U.S. at 101 (quoting <u>Strickland</u>, 466 U.S. at

16  687).  The <u>Strickland</u> standard applies to trial and appellate counsel.  <u>Smith v. Murray</u>, 477

17  U.S. 527, 535-36 (1986); <u>Miller v. Keeney</u>, 882 F.2d 1428, 1433 (9th Cir. 1989).

18       Under AEDPA, a federal court's review of a state court's decision on an IAC claim

19  is "doubly deferential."  <u>Cullen v. Pinholster</u>, 563 U.S. 170, 190 (2011).  "[T]he question is

20  not whether counsel's actions were reasonable.  The question is whether there is any

21  reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard."  <u>Harrington v.</u>

22  <u>Richter</u>, 562 U.S. 86, 105 (2011).  In other words, "[t]he pivotal question is whether the

23  state court's application of the <u>Strickland</u> standard was unreasonable.  This is different from

24  asking whether defense counsel's performance fell below <u>Strickland</u>'s standard."  <u>Griffin v.</u>

25

26

27       [43] Because Petitioner's state habeas petition was not scanned into the Court's
electronic case management filing system, page number citations refer to those assigned by
28  Petitioner.  <u>See</u> Resp't Ex. I.

24

1  Harrington, 727 F.3d 940, 945 (9th Cir. 2013)) (quoting Richter, 562 U.S. at 101).

2  Applying this doubly deferential standard, the Court now reviews Petitioner's IAC claims.

3  **1.   Battered Woman's Syndrome Expert**

4    Petitioner contends that trial counsel erred in failing to present evidence at trial from

5  a Battered Woman's Syndrome ("BWS") expert.  Resp't Ex. I at 22.[44]  Such evidence,

6  Petitioner claims, would have "corroborate[d] [her] duress defense after the murder, as [the]

7  prosecution used [her] actions after the murder as motive to cover up murder, as a

8  consciousness of guilt for what she had done, as there was no direct evidence that [she] had

9  killed her mother or dismembered her."  Id.  As support, Petitioner has attached pages from

10  the Reporter's Sealed Transcript (RT 2273 to RT 2280) from the closed proceedings

11  (outside the presence of the prosecutor and the judge) held on April 2, 2002.  During that

12  proceeding, the trial court addressed Petitioner and her trial counsel regarding Petitioner's

13  desire to present evidence from a BWS expert.  Dkt. 19-8 at 97-106.  Trial counsel

14  represented to the trial court that he had consulted a BWS expert, Dr. Kathleen O'Meara,

15  who had opined that Petitioner did not meet the criteria for the syndrome.  Based on the

16  expert's opinion, trial counsel decided not to pursue that issue.  Id. at 100-01.

17    Since the California Supreme Court rejected Petitioner's IAC claim without

18  explanation, the Court must independently review the state court record to determine

19  whether there was any "reasonable basis for the state court to deny relief."  Harrington, 562

20  U.S. at 98.  Here, the record shows that trial counsel did not offer a BWS expert because he

21  concluded Petitioner did not satisfy the criteria for BWS.  As such, the California Supreme

22  Court could have reasonably construed trial counsel's conscious decision not to call a BWS

23  expert as a strategic or tactical matter, which is entitled to substantial deference.  See

24  Turner v. Calderon, 281 F.3d 851, 876 (9th Cir. 2002) ("The choice of what type of expert

25  to use is one of trial strategy and deserves 'a heavy measure of deference.'"); Wiggins v.

26  Smith, 539 U.S. 510, 523 (2003) (holding that evidence that the challenged trial conduct

27  

28    [44] At the time of trial, California law permitted the admission of BWS evidence.
Cal. Evid. Code § 1107 (effective Jan. 1, 2001 to Dec. 31, 2004).

1  resulted from inattention rather than from strategic considerations may also be relevant to

2  the inquiry of whether a decision was a tactical one).  While Petitioner may believe that

3  trial counsel should have presented BWS evidence notwithstanding the opinion of Dr.

4  O'Meara, a mere difference of opinion is insufficient to establish an IAC claim.  See United

5  States v. Mayo, 646 F.2d 369, 375 (9th Cir. 1981) (holding that a difference of opinion as

6  to trial tactics does not constitute denial of effective assistance).  Relief on this claim is

7  DENIED.

8                    **2.      Coerced Interview**

9          Petitioner contends that after she passed two polygraph tests, her trial counsel

10 coerced her into agreeing to be interviewed by the prosecutor.  According to Petitioner,

11 counsel told her that she had to speak with the prosecutor or else "they would come and

12 drag [her] across the street, strap [her] to a chair and make [her] talk."  Resp't Ex. I at 31.

13 Petitioner acknowledges that, before meeting with the prosecutor, she signed a waiver of

14 her right to remain silent.  She then spoke to the prosecutor and gave a statement that was

15 admitted in evidence.  Petitioner later moved to exclude that statement, but was

16 unsuccessful.  Petr's. Exh. XX.

17         During a closed session outside the presence of the prosecution and jury, trial

18 counsel revealed that his plan was for Petitioner to undergo another polygraph test, and

19 thereafter testify as a witness against Cunningham in exchange for an accessory after the

20 fact charge.  Dkt. 19-10 at 111.  That plan did not materialize.  Nonetheless, in view of the

21 record presented, the California Supreme Court could have reasonably concluded that trial

22 counsel's advice to Petitioner to speak with the prosecution was a tactical matter that did

23 not amount to ineffective assistance.  Dkt. 19-10 at 111.[45]  Therefore, relief on this claim is

24 DENIED.

25

26

27         _____

          [45] Even if Petitioner's statement had not been admitted in evidence, the other
   evidence implicating her was significant.  The homicide occurred in her presence, she had a
28 motive, and she afterwards fled and tried to conceal the body.

1

### 3.    Threats by Cunningham

2   Petitioner alleges, in a completely discursive manner, that trial counsel failed to

3   conduct an adequate investigation or present evidence regarding Cunningham's threats to

4   her and others, which she claims would have been germane to his culpability for the

5   murder.  Resp't Ex. I at 37-42.

6   "[T]he Constitution guarantees criminal defendants 'a meaningful opportunity to

7   present a complete defense,'" Holmes v. South Carolina, 547 U.S. 319, 324 (2006) (quoting

8   Crane v. Kentucky, 476 U.S. 683, 690 (1986)), which includes the right to present evidence

9   and the testimony of witnesses, see Washington v. Texas, 388 U.S. 14, 19 (1967).  But the

10  right is only implicated when the evidence the defendant seeks to admit is "relevant and

11  material, and . . . vital to the defense."  Id. at 16.  The exclusion of evidence may give rise

12  to a federal claim only when it is "arbitrary or disproportionate to the purposes [the

13  exclusionary rule applied is] designed to serve."  Holmes, 547 U.S. at 324 (internal citation

14  and quotation marks omitted).

15  At trial, the court allowed Petitioner to present evidence regarding Cunningham's

16  conduct to establish Petitioner's state of mind and that her actions after her mother's death

17  were committed because she feared Cunningham, not because she had a consciousness of

18  guilt.  Bernard, 2006 WL 449017, at *13.  The jury heard testimony regarding incidents

19  such as Cunningham's setting fire to vehicles and a fence near Petitioner's home, breaking

20  the window of her car while she sat inside it, ripping out telephone lines, putting glue in her

21  door locks, slashing a friend's car tires after she spent the night at his home, cutting the

22  transmission lines on her car, and scratching his initials into the sidewalk in front of

23  Margaret's condominium.  Id.  The trial court, however, disallowed evidence regarding

24  Cunningham's behavior as it pertained to third parties.  Id.  On direct appeal, the California

25  Court of Appeal held that the third party evidence was properly excluded as irrelevant

26

27

28

under state law, id. at *16-17, and that Petitioner lacked "a constitutional right to present a defense that was inconsistent with her own testimony," id. at *17.[46]

The record demonstrates that there is no merit to Petitioner's claim that her trial counsel was ineffective with respect to investigating and presenting evidence of Cunningham's culpability.  The jury heard substantial evidence that Petitioner was afraid of Cunningham, that Cunningham had made threats and had the potential for violence.  As for the incidents involving other parties, trial counsel made repeated, albeit unsuccessful, efforts to present such evidence.  Bernard, 2006 WL 449017, at *13.  Trial counsel cannot be faulted for not presenting evidence that was ruled irrelevant by the trial court.  See Rupe v. Wood, 93 F.3d 1434, 1445 (9th Cir.1996) ("[T]he failure to take a futile action can never be deficient performance . . . .").  To the extent that Petitioner is challenging the state court's exclusion of evidence pertaining to Cunningham's conduct toward individuals other than her, such a claim is not cognizable in this federal habeas proceeding.  See Langford v. Day, 110 F.3d 1380, 1389 (9th Cir.1996) ("[A]lleged errors in the application of state law are not cognizable in federal habeas corpus.").  Relief on this claim is DENIED.

### 4.    Failure to Elicit Testimony

Petitioner contends that trial counsel was ineffective for failing to present evidence from two witnesses, Terry George and his mother, Alice George.  According to Petitioner, testimony from these individuals "could put Ed Cunningham at the crime scene at the alleged time of [the] murder."  Resp't Ex. I at 44.  As support for this claim, Petitioner cites an undated letter addressed to her from trial counsel summarizing a conversation between his private investigator and Mr. George.  Mr. George told the investigator that his mother had stated that on the day of the murder, Cunningham came by and asked to use the telephone, though she rejected his request.  Dkt. 19-10 at 96.  In the letter, trial counsel informed Petitioner that he believed that such testimony might be "helpful," but that Ms. George "does not want to be involved" and will no longer speak to the investigator.  Id.

---

[46] A state appellate court's determination of state law is binding in a federal habeas action.  See Estelle, 502 U.S.at 67-68.

1   Petitioner now faults trial counsel for not eliciting the aforementioned information from

2   Mr. George or Ms. George at trial in order to establish that Cunningham was coming from

3   Petitioner's residence, which was located approximately about six houses away from the

4   George home.  Resp't Ex. I at 44.[47]

5           Upon independent review, the Court finds that the California Supreme Court's

6   summary denial of this claim was not objectively unreasonable.  Testimony from Mr.

7   George regarding what his mother had relayed about Cunningham would likely have been

8   excluded as inadmissible hearsay.  As for Ms. George, counsel believed that she had no

9   desire to assist the defense.  The failure of defense counsel to take a futile action does not

10  constitute ineffective assistance.  See Rupe v. Wood, 93 F.3d 1434, 1444-45 (9th Cir.

11  1996).  Moreover, the California Supreme Court could have reasonably construed trial

12  counsel's decision not to call either witness as a tactical decision, which is not reviewable

13  in a federal habeas action.  See Strickland, 466 U.S. at 690 (reasonable, strategic choices by

14  counsel such as this are "virtually unchallengeable" on federal habeas corpus review); see

15  also Matylinsky v. Budge, 577 F.3d 1083, 1091 (9th Cir. 2009) (the court may "neither

16  second-guess counsel's decisions, nor apply the fabled twenty-twenty vision of

17  hindsight . . . .").

18          The above notwithstanding, Petitioner has failed to demonstrate that testimony

19  regarding Ms. George's interaction with Cunningham would have altered the outcome at

20  trial.  Though not entirely clear, Petitioner appears to argue that Ms. George's testimony

21  would have placed Cunningham near the victim's home around the time of the murder.

22  However, as the California Court of Appeal noted in its decision affirming the judgment on

23  direct appeal, the "[a]uthorities could not determine the exact date and time of death from

24  the physical evidence in this case."  Bernard, 2006 WL 449017, *5.  The victim's time of

25  ─────────────────────
        [47] Petitioner also cites a "Witness Memorandum," dated March 30, 2002, addressed
26  to trial counsel from his investigator, summarizing a conversation she had with Ms.
    Hardcastle (i.e., Cunningham's alibi witness).  Id.  Ms. Hardcastle recalled that
27  Cunningham had worked on her car the day before Easter and left in the evening.  Id.  Such
    information, Petitioner contends, was important because it showed that Cunningham was
28  "at the scene at the alleged time of the murder."  Resp't Ex. I at 45.

1  death to could only be narrowed to "sometime after [she] was last seen alive on April 13

2  and before her body was found on April 20."  Id.  In view of the uncertainty surrounding

3  the exact time and date of the murder, Ms. George's putative testimony (i.e., that

4  Cunningham was seen at or near the victim's residence on April 14) would not have

5  conclusively established that Cunningham, as opposed to Petitioner, committed the murder.

6  Relief on this claim is DENIED.

7                           **5.**        **Lack of "Direct Evidence"**

8          Petitioner contends that trial counsel was ineffective for failing to present evidence

9  "that there was no direct evidence against Petitioner due to Antioch Police Department

10  'messing up' crime scene."  Resp't Ex. I at 48-49.  This claim is entirely speculative, as

11  Petitioner does not delineate what particular evidence should or should not have been

12  elicited or how the admission and/or failure to present such evidence prejudiced her at trial.

13  To the extent that Petitioner is suggesting that the lack of direct evidence necessarily

14  compelled her acquittal, she is incorrect.  See Walters v. Maass, 45 F.3d 1355, 1358 (9th

15  Cir. 1995) ("Circumstantial evidence and inferences drawn from it may be sufficient to

16  sustain a conviction.") (citations and internal quotations marks omitted).  The Court finds

17  that the California Supreme Court had an objectively reasonable basis for rejecting

18  Petitioner's IAC claim.  Relief on this claim is DENIED.

19                           **6.**        **Failure to Raise Claims on Appeal**

20          Petitioner claims that she was denied the effective assistance of appellate counsel

21  because Attorney Morse only raised one claim on direct appeal, as opposed to all of the

22  claims alleged herein.  Resp't Ex. I at 53-55.  Appellate counsel, however, has no

23  constitutional duty to raise every nonfrivolous issue requested by a defendant.  See Jones v.

24  Barnes, 463 U.S. 745, 751-54 (1983).  Indeed, the ability to weed out weaker issues is

25  widely recognized as one of the hallmarks of effective appellate advocacy.  Miller, 882

26

27

28

F.2d at 1434.[48]  In any event, Petitioner has made no showing that she would have prevailed on appeal on any of the claims she asserts that appellate counsel should have raised.  Indeed, the fact that the California Supreme Court rejected all of Petitioner's habeas claims on the merits strongly suggests that the result would have been no different had Attorney Morse raised those claims on direct appeal.  Relief on this claim is DENIED.

### 7.    Cumulative Error/Bank of the West Videotape

In her habeas petition, Petitioner's characterizes this claim in terms of cumulative prejudice from trial counsel's alleged errors; however, the body of her argument discusses the failure to obtain a videotape from the Bank of the West.  Resp't Ex. I at 59.  In either event, Petitioner has not stated a claim for habeas relief.

The cumulative effect of several errors may sufficiently prejudice a defendant for purposes of habeas relief, even if a single error, standing alone, is insufficient.  See Alcala v. Woodford, 334 F.3d 862, 893-95 (9th Cir. 2003).  Because Petitioner has not shown a single constitutional error by trial counsel, her cumulative error claim necessarily fails.  See Mancuso v. Olivarez, 292 F.3d 939, 957 (9th Cir. 2002).  Therefore, the California Supreme Court's denial of this claim was not objectively unreasonable.  Accordingly, relief on this claim, insofar as it is predicated upon cumulative error, is DENIED.

Petitioner's claim regarding the videotape also fails.  According to Petitioner, the videotape would have shown that the victim was at the Bank of the West in the early afternoon of April 14, 2001—ostensibly the day of the murder.  Resp't Ex. I at 59-60.  The probative value of the tape is unclear, as it does not involve the murder scene or exculpate Petitioner.  That aside, Petitioner does not contend that she furnished the tape to the

---

[48] In a letter dated February 1, 2006, Attorney Morse explained why he chose to raise only one issue on direct review.  He stated:  "I assure you that I carefully considered your case and concluded that any potential issue I was aware of that would involve prosecutorial misconduct, the jury, DNA testing, ineffective assistance of counsel, or anything else, not only had absolutely no chance of success in your appeal, but would probably just distract the Court of Appeal from concentrating on the one issue that actually does have a chance of convincing the Court to reverse your conviction."  Dkt. 19-11 at 50-51.

California Supreme Court or otherwise demonstrated that such a tape actually exists. Consequently, there is no basis for concluding that the California Supreme Court applied the <u>Strickland</u> standard in an unreasonable manner.  Relief on this claim is DENIED.

### 8.   Surveillance Tapes

Petitioner contends that trial counsel was ineffective for failing to obtain surveillance tapes of various stores, including 7-Eleven and Walmart, "in 2 different counties where Cunningham was on video entering stores and would have placed him buying objects [admitted] in evidence . . . ."  Resp't Ex. I at 60.

The record shows that at the time Petitioner was arrested, police searched her purse and found various receipts dated April 14 and 16.  <u>Bernard</u>, 2006 WL 449017, *2.  Two of these receipts were from the Antioch and Pittsburg Walmart stores, and one indicated that a machete (akin to the one found at the crime scene) had been purchased on April 16.  <u>Id.</u> Another April 16 receipt evidenced a visit to an Oakley Albertson's store.  <u>Id.</u> A surveillance videotape from the Oakley Albertson's at the time indicated on this receipt showed a man resembling Cunningham in the store.  He appeared to be alone and Petitioner's image did not appear on the videotape.  <u>Id.</u> at *2 fn. 14.

The California Supreme Court appropriately rejected Petitioner's IAC claim regarding the failure to obtain store videotapes.  Aside from the Oakley Albertson's store tape, Petitioner does not allege that any other tapes actually existed or were provided to the California Supreme Court.  <u>See</u> <u>Pinholster</u>, 563 U.S. at 180-84 (a habeas petitioner cannot supplement the record in federal court).  Moreover, even if trial counsel had obtained such surveillance videotapes, there is no evidence or allegation that anything disclosed therein would have exculpated Petitioner.  Relief on this claim is DENIED.

### 9.   Failure to Object to Prosecutor's Closing Argument

Petitioner contends that trial counsel erred in failing to object to the prosecutor's claim during closing argument that she was not afraid of Cunningham.  Resp't Ex. I at 60. The prosecutor made these remarks in response to Petitioner's testimony that she suffered from BWS.  However, as Respondent correctly points out, the prosecutor tethered her

comments regarding Petitioner and Cunningham to the evidence presented at trial.  RT

2941-2946, 3008-3025.  Although defense counsel repeatedly objected during rebuttal

when the prosecutor was discussing Petitioner's alleged fear of Cunningham, the trial court

consistently overruled the objections on the basis that the prosecutor's statements were

legitimate argument.  RT 3010, 3014, 3016, 3023, 3025.[49]

In any event, even if trial counsel failed to object to certain of the prosecutor's

statements, Petitioner has failed to make any showing to overcome the presumption that the

failure to object was a matter of trial strategy.  See Morris v. Cal., 966 F.2d 448, 456 (9th

Cir. 1991) ("[a]n attorney's failure to object to the admission of inadmissible evidence is

not necessarily ineffective" but is presumed to be sound trial strategy which the movant

must overcome); People v. Williams, 16 Cal.4th 153, 221 (1997) (a defense attorney's

failure to object at trial rarely establishes ineffectiveness).  In the instant case, defense

counsel may have chosen not to object to all of the prosecution's statements to avoid

drawing undesired attention to them.  See United States v. Molina, 934 F.2d 1440, 1448

(9th Cir. 1991) ("From a strategic perspective . . . many trial lawyers refrain from objecting

during closing argument to all but the most egregious misstatements by opposing counsel

on the theory that the jury may construe their objections to be a sign of desperation or

hyper-technicality.").  Nor has Petitioner made any showing that any additional

objections—assuming they would have been sustained—would have altered the outcome at

trial.  See Jackson v. Brown, 513 F.3d 1057, 1082 (9th Cir. 2008) ("[E]ven if [counsel's]

---

[49] Certain pages from the Reporter's Transcript were missing from the exhibits initially filed by Respondent.  See Resp't Ex. B (Vols. 14 (ends at RT 2919), 15 (starts at RT 3140).  Among the missing pages were those that Respondent had cited relating to the prosecutor's closing argument.  Dkt. 69-1 at 20 (citing RT 2941-2946, 3008-3025).  However, Respondent has since filed a new "Exhibit B," which now contains the missing pages from the prosecutor's and trial counsel's closing arguments, which begins with the prosecutor's continuation of her closing argument at RT 2920 and ends after the prosecutor's rebuttal at RT 3038.  See Dkt. 76.  The new "Exhibit B" contains RT 2920 through RT 3116.  Id.  Respondent's counsel has informed Clerk's office staff that he has been unable to retrieve the other missing pages, RT 3117 through RT 3139, and therefore he could not provide them to the Court.  Because these missing pages relate to post-verdict proceedings that have not been cited to by either party, the Court need not consider them in order to issue its ruling.

failure to object was deficient, we cannot find that, but for his errors, there is a reasonable probability that the jury would not have still convicted [petitioner].").  Because the California Supreme Court did not unreasonably apply <u>Strickland</u>, relief on this claim is DENIED.

### 10.     Other Cases with Cunningham

Petitioner contends that defense counsel was ineffective for failing to recognize that the prosecutor and the trial judge had previously been involved in cases where Cunningham was the defendant.  Resp't Ex. I at 61.  In relation to this claim, Petitioner has attached a motion to disqualify the trial judge that trial counsel allegedly chose not to file.  Dkt. 19-10 at 60-63.  Citing this particular exhibit, Petitioner asserts, somewhat inconsistently, that trial counsel sought to disqualify the trial judge but was unsuccessful.  Dkt. 69-1 at 21.

It is unclear from the record presented whether a disqualification motion was, in fact, made.  Nevertheless, Petitioner has not identified any clearly established Supreme Court authority requiring disqualification of a prosecutor or judge who previously prosecuted another suspect or presided over a case involving that suspect, respectively.  Nor has Petitioner demonstrated that the result at trial would have been different had defense counsel successfully brought such a motion.  As such, the California Supreme Court had an objectively reasonable basis under <u>Strickland</u> for rejecting Petitioner's IAC on either of these bases.  Relief on this claim is DENIED.

### 11.     Failure to Investigate Whether Cunningham Was an Informant

Petitioner accuses trial counsel of failing to investigate whether Cunningham was an informant.  Resp't Ex. I at 62.  There is no evidence that Cunningham was, in fact, an informant.  Nonetheless, it is unclear what purpose an investigation would have served, since Cunningham did not provide any substantive testimony at trial and information regarding informants is privileged.  <u>See</u> Cal. Evid. Code § 1041.[50]  The Court finds that the

---

[50] As noted, the California Court of Appeal's decision notes that outside the presence of the jury, Cunningham was questioned about his part in Margaret's death.  He declined to answer these questions, asserting his privilege against self-incrimination.  <u>Bernard</u>, 2006 WL 449017, at *5.

California Supreme Court had an objectively reasonable basis for rejecting Petitioner's claim that defense counsel erred in failing to investigate Cunningham, and therefore, relief on this claim is DENIED.[51]

### 12.   Processing the Crime Scene

Petitioner contends that trial counsel should have informed the jury that the crime scene was not processed until three days after Margaret's body had been removed.  Resp't Ex. I at 64.  Petitioner also claims that the investigation was "sloppy" and had jurors been advised as such, they would have questioned the "authenticity" of the charges alleged against her.  Id.  With regard to Petitioner's first contention, the jury was informed as to the sequence of events relevant to the murder investigation.  As to her other claim, there is no evidence that the investigation was "sloppy."  But even if there were, Petitioner's suggestion that the jury would have weighed that information more heavily than the inculpatory evidence presented at trial is entirely speculative.  See Gonzalez v. Knowles, 515 F.3d 1006, 1016 (9th Cir. 2008) (holding that speculation regarding the impact an investigation into the defendant's mental health condition would have had at sentencing was "plainly insufficient to establish prejudice" under Strickland).  Because there is no basis for concluding that the California Supreme Court unreasonably applied Strickland, relief on this claim is DENIED.

### 13.   Failure to Question Corporal Delavan

Petitioner contends that counsel was ineffective for failing to examine Corporal Delavan, who investigated the murder, about an alleged conversation he had with Cunningham.  In that conversation, Cunningham allegedly did not deny being at Petitioner's residence at the time of the murder.  Resp't Ex. I at 65.  According to

---

[51] The record shows that on July 16, 2004, Petitioner filed a pro se post-trial motion entitled, "Motion to Question Ed Cunningham Being an Informant for the District Attorney."  CT 1178.  That motion was set for hearing on July 26, 2004 at 8:30 a.m.  The record shows that, according to the handwritten minute notes on July 26, 2004, the motion was "denied [as] untimely" and for lack of jurisdiction.  CT 1183.  Even if the motion were granted, Petitioner is not allowed to supplement the record to support his federal habeas claims.  Pinholster, 563 U.S. at 180-84

1  Petitioner, this information is contained "in police reports," which she has not submitted as

2  an exhibit because they are "lost."  Id.

3       The record does not support Petitioner's claim that trial counsel's performance was

4  deficient or that she suffered any prejudice as a result of his failure to ask Corporal Delavan

5  about his conversation with Cunningham.  In fact, trial counsel sought to make such an

6  inquiry, but was foreclosed from doing so upon a sustained objection from the prosecutor.

7  RT 2124-25.  Defense counsel can hardly be faulted for not interposing questions which the

8  trial court ruled he could not ask.  That aside, there is no documentation to substantiate

9  Petitioner's claim regarding what Cunningham purportedly stated.  For these reasons, relief

10  on this claim is DENIED.

11       **14.**     **Petitioner's Charges Against Cunningham**

12       Petitioner contends that trial counsel was remiss in failing to elicit evidence that

13  Petitioner had pressed charges against Cunningham for assault.  Resp't Ex. I at 66.  But

14  according to the California Court of Appeal's opinion, such evidence had, in fact, been

15  elicited.  See Bernard, 2006 WL 449017, *7 ("On January 26, Bernard actually pressed

16  charges against Cunningham.  He punched his fist through Bernard's car window while she

17  was locked inside, cutting her face with the broken glass.  Bernard's car was later found

18  with a smashed driver's side window.").  Given the lack of factual (or legal) foundation for

19  her IAC claim, it was objectively reasonable for the California Supreme Court to reject it.

20  Relief on this claim is DENIED.

21       **15.**     **Petitioner's Fear of Cunningham**

22       Petitioner contends that defense counsel was ineffective for failing to elicit evidence

23  that, after the murder, Petitioner was fearful of Cunningham because he had access to a

24  shotgun in their car.   Resp't Ex. I at 67.  However, Petitioner has failed to cite any record

25  evidence demonstrating that Cunningham, in fact, had access to a shotgun.  As such, it was

26  objectively reasonable for the California Supreme Court to conclude that Petitioner had

27  failed to demonstrate deficient performance by defense counsel or resulting prejudice.

28  Relief on this claim is DENIED.

1

## 16.    Involuntary Manslaughter Instruction

2      Petitioner contends that trial counsel was ineffective for failing to request an

3  instruction on involuntary manslaughter.  Resp't Ex. I at 69-70.  Involuntary manslaughter

4  is a homicide "in the commission of an unlawful act, not amounting to felony; or in the

5  commission of a lawful act which might produce death, in an unlawful manner, or without

6  due caution and circumspection."  Cal. Penal Code § 192(b).  By its nature, involuntary

7  manslaughter is an unintentional or "accidental" killing in the sense that the death is caused

8  by reckless or criminally negligent, rather than intentional conduct by the defendant.

9  People v. Broussard, 76 Cal. App. 3d 193, 197 (1977); People v. Velez, 144 Cal. App. 3d

10 558, 566 (1983).

11     Under California law, "a trial judge has no duty to instruct on any lesser offense

12 unless there is substantial evidence to support such instruction."  People v. Cunningham, 25

13 Cal. 4th 926, 1008 (2001).  In this case, the Court of Appeal noted that the prosecution

14 established that the victim's death was the result of strangulation for a period long enough

15 to produce death.  Bernard, 2006 WL 449017, *5.  Furthermore, "[a] forensic pathologist

16 opined that Margaret fell or hit her head, causing her to lose consciousness before she was

17 strangled."  Id.  Evidence of Margaret's death by strangulation—possibly while

18 unconscious—is inconsistent with a finding that the homicide either occurred (1) in the

19 course of an unlawful act that is less than a felony or (2) was due to Petitioner's mere

20 negligence or recklessness.  Thus, given the lack of substantial evidence at trial to warrant

21 an involuntary manslaughter instruction, any request for such instruction would have failed

22 under California law.  Under those circumstances, the failure to request such an instruction

23 does not amount to deficient performance.  See James v. Borg, 24 F.3d 20, 27 (9th Cir.

24 1994) (finding no ineffective assistance where the motion that allegedly should have been

25 made would have been futile).[52]  Relief on this claim is DENIED.

26     _____
       [52] Even if there were a basis for such an instruction, there was no need to request
27 one, since the trial court would have been required to provide one sua sponte.
   Cunningham, 25 Cal.4th at 1008.  Moreover, there was no prejudice, since the jury, which
28 had the option of convicting Petitioner of second degree murder, found her guilty of first
   degree murder.

1

### 17.      Taped Conversation with Polygraph Examiner

2

Petitioner maintains that trial counsel should have sought to introduce a taped

3 conversation she had with the first polygraph examiner, W. Michael Floyd, M.S., J.D.

4 Resp't Ex. I at 71-72.  Petitioner claims that she is certain that her responses to Mr. Floyd's

5 questions would have exculpated her.  Id.  To the extent Petitioner desired to introduce

6 statements from the tape for the truth of the matter asserted, such statements would have

7 been inadmissible hearsay.  As such, defense counsel cannot be faulted for failing to

8 introduce evidence that would likely have been disallowed.  See James, 24 F.3d at 27.  Nor

9 has Petitioner shown that the tape—assuming the trial court would have allowed its

10 admission—would have altered the outcome at trial.  Relief on this claim is DENIED.

11

### 18.      "Accessory After the Fact"

12

Petitioner avers that trial counsel should have objected on relevancy grounds to

13 evidence allegedly showing that she was an accessory after the fact, given that she was not

14 charged with that offense (i.e., California Penal Code § 32).  Resp't Ex. I at 73.  She

15 allegedly told trial counsel that he should ask for a jury instruction for accessory after the

16 fact "so they would know what it was."  Id. at 74.  Because Petitioner had not been charged

17 with that offense, defense counsel declined to make such a request.  Petitioner claims that

18 defense counsel's failure to raise an evidentiary challenge or to request the aforementioned

19 jury instruction demonstrates that he provided ineffective assistance.

20

The California Supreme Court did not unreasonably reject Petitioner's IAC claim.

21 First, evidence pertaining to Petitioner's post-murder conduct was relevant to whether she

22 committed the killing.  People v. Jones, 14 Cal. App. 4th 1252, 1258 (1993) (evidence of

23 defendant's post-murder "lying and covering up" was potentially relevant to show

24 "consciousness of guilt of [murder]").  Second, trial counsel's decision not to request an

25 accessory after the fact instruction was reasonable in view of the fact that Petitioner was not

26 charged with that offense, coupled with the absence of any evidence that the prosecution

27 would have agreed to such an instruction.  People v. Jennings, 50 Cal.4th 616, 668 (2010)

28

("California law does not permit a court to instruct concerning an uncharged lesser *related* crime unless agreed to by both parties.") (emphasis added).

The objective reasonableness of trial counsel's decision not to seek an accessory after the fact instruction is further supported by the Court of Appeal's reasoned opinion on direct appeal:

> Bernard's defense—grounded in her claim that she acted under duress, out of fear of Cunningham when she helped him dispose of Margaret's body—is weak, for two reasons. First, she was not charged with any offense other than the murder itself. Bernard's defense to that charge was not that Cunningham compelled her to kill Margaret, but that she did not do so at all. Second and more importantly, *Bernard's claim that her acts after the murder were the result of her fear of Cunningham is inconsistent with her own testimony that until she escaped from Cunningham, she actually believed that she had killed Margaret.* The clear implication of her statement that—at all relevant times—she believed that she had killed her mother was that she participated in the disposal of Margaret's body in order to conceal evidence of what she then believed was her crime, not that committed by Cunningham.

Bernard, 2006 WL 449017, *17 (emphasis added).  Thus, it is evident that trial counsel, in fact, presented Petitioner's defense theory, i.e., that Petitioner only disposed of Margaret's body under duress—but did not participate in the murder, and therefore, could not be found guilty of murder.  Because being an "accessory after the fact" was not a lesser included offense of murder, nor was it a legal defense to any charged crime, and because Petitioner was able to thoroughly argue her aforementioned defense, it was not constitutional error for the trial court to fail to instruct the jury on "accessory after the fact."  Cf. Hopkins v. Reeves, 524 U.S. 88 (1998) (holding that the Constitution does not require the jury to be instructed on offenses that are not lesser-included offenses of the charged crimes); Solis v. Garcia, 219 F.3d 922, 929 (9th Cir. 2000) (failure to instruct on lesser-included offenses is not a constitutional error).  Relief on this claim is DENIED.

### 19.   "Newly Discovered Evidence" and Repeated IAC Claims

Petitioner contends that she has "newly discovered evidence" that Corporal Delavan testified at trial in a manner inconsistent with the information in his police report.  See

1    Resp't Ex. I at 76.  She asserts that in that report, Corporal Delavan told Cunningham,

2    "I know you were there," but at trial, "Delavan protected Cunningham."  Id.  This assertion

3    is essentially the same as Petitioner's earlier claim that trial counsel erred in failing to

4    question Corporal Delavan regarding his conversation with Cunningham.  Id. at 65.  As

5    discussed above, trial counsel attempted to question Corporal Delavan but was prevented

6    from doing so by the trial court.  Petitioner's ancillary complaints that trial counsel failed to

7    elicit testimony or evidence from (1) Annette Hardcastle, as well as Terry and Alice

8    George, relating to Cunningham's presence at the crime scene at the time of the murder and

9    (2) regarding Cunningham's third party culpability have already been considered and

10   rejected above by the Court.  See Resp't Ex. I at 76-78.  Relief on these claims is DENIED.

11          **B.    JUDICIAL MISCONDUCT**

12          Petitioner multiple claims under the heading of "judicial misconduct," most of which

13   are directed against Judge Laurel Brady of the Contra Costa County Superior Court.  Resp't

14   Ex. I at 81-116.

15          The Due Process Clause guarantees a criminal defendant the right to a fair and

16   impartial judge.  See In re Murchison, 349 U.S. 133, 136 (1955).  A claim of judicial

17   misconduct by a state judge in the context of federal habeas review does not simply require

18   that the federal court determine whether the state judge committed judicial misconduct;

19   rather, the question is whether the state judge's behavior "rendered the trial so

20   fundamentally unfair as to violate federal due process under the United States

21   Constitution."  Duckett v. Godinez, 67 F.3d 734, 740 (9th Cir. 1995) (citations omitted).

22   To succeed on a judicial bias claim, a petitioner must "overcome a presumption of honesty

23   and integrity in those serving as adjudicators."  Withrow v. Larkin, 421 U.S. 35, 47 (1975).

24   "In the absence of any evidence of some extrajudicial source of bias or partiality, neither

25   adverse rulings nor impatient remarks are generally sufficient to overcome the presumption

26   of judicial integrity, even if those remarks are "critical or disapproving of, or even hostile

27   to, counsel, the parties, or their cases.'"  Larson v. Palmateer, 515 F.3d 1057, 1067 (9th Cir.

28   2008) (quoting Liteky v. United States, 510 U.S. 540, 555 (1994)).  Indeed, bias can

"almost never" be demonstrated solely on the basis of a judicial ruling.  Liteky, 510 U.S. at 555.

### 1.    Denial of Post-Verdict Motion for Law Library Access

Petitioner contends that post-verdict, while she was pro se, the trial court committed judicial misconduct by denying a motion for access to an allegedly "male only law library." According to Petitioner, had such access been provided, she could have filed a more effective motion for new trial.  However, Judge Brady found that Petitioner had the same library access as any other inmate at the West County Detention Facility, where access to legal materials is facilitated through librarians, as opposed to physical access to the library. RT 3202-3203.  Judge Brady also confirmed "with the commander who's in charge of the facility at West County as well as the law librarian," and concluded that "there was nothing about [Petitioner's] access that was . . . different than anyone else at the main detention facility nor was there any delay in getting . . . the materials . . . ."  RT 3203.

Here, Petitioner fails to point to any evidence in the record, aside from the ruling on her motion of law library access, to support her claim of judicial bias.  An adverse court ruling, standing alone, is insufficient to sustain a claim for habeas relief.  See Larson, 515 F.3d at 1067 (affirming denial of habeas relief on judicial misconduct claim "[b]ecause [the petitioner] has provided no evidence of the trial court's alleged bias outside of these rulings and remarks—which themselves revealed little more than the occasional mild frustration with Larson's pro se lawyering skills—his claim that he was denied a fair trial also fails."). Relief on this claim is DENIED.[53]

### 2.    Conflict of Interest

Petitioner alleges that Judge Brady had a "conflict of interest" based on having previously presided over a case in which Cunningham was charged with possession of

---

[53] Petitioner's reliance on Bribiesca v. Galaza, 215 F.3d 1015 (9th Cir. 2000), is misplaced.  In that case, the court noted that "[a]n incarcerated criminal defendant who chooses to represent himself has a constitutional right to access to 'law books . . . or other tools' to assist him in preparing a defense.  Id. (quoting Milton v. Morris, 767 F.2d 1443, 1446 (9th Cir. 1985)).  Bribiesca concerned the issue of self-representation, not judicial misconduct.

methamphetamine.  Petitioner alleges that Judge Brady ordered Cunningham's release in 2001.  Resp't Ex. I at 90-91.  In addition, Petitioner claims that, in this case, "Cunningham was offered immunity in exchange for testimony, thus depriving petitioner of the right to cross examine, which is a violation of the U.S. Constitution Amend. 6 & 14 also due process," and that Judge Brady "ordered Cunningham released from jail . . . ."  Id.

The record does not support Petitioner's claim of judicial misconduct based on a conflict of interest.  The mere fact that Judge Brady presided over a case in which Cunningham ostensibly was a party is not proof of bias or judicial misconduct, particularly where, as here, the record is devoid of information regarding the circumstances surrounding the prior case.  There also is no evidence that Cunningham was granted immunity, which, under California law, is determined in the first instance by the prosecutor, not the trial court.  People v. Williams, 43 Cal.4th 584, 622 (2008).  Moreover, the record shows that Cunningham asserted his Fifth Amendment right against self-incrimination and declined to answer questions at trial regarding his involvement in the murder.  Bernard, 2006 WL 449017, at *5.  Even if the record supported a claim that Judge Brady was biased in favor of Cunningham—which it clearly does not—Petitioner has made no showing that it "rendered the trial so fundamentally unfair as to violate federal due process under the United States Constitution."  Duckett, 67 F.3d at 740.  Relief on this claim is DENIED.

### 3.    Denial of Post-Conviction Motion to Appoint BWS Expert

Petitioner contends that the trial judge erred in denying a post-conviction motion to appoint a BWS expert.  The purpose of the expert, according to Petitioner, was to establish a claim of ineffective assistance of counsel in a motion for new trial.  Resp't Ex. I at 93-94.  As discussed above, an adverse ruling, without more, is insufficient to demonstrate judicial misconduct.  See Larson, 515 F.3d at 1067.

Nor does the Court find any merit to Petitioner's assertion that Judge Brady's denial of her motion "violated [her] constitutional right to present a defense."  Resp't Ex. I at 94.  Whether construed under the Fourteenth or Sixth Amendments, the Constitution guarantees defendants 'a meaningful opportunity to present a complete defense.'"  Crane v. Kentucky,

476 U.S. 683, 690 (1986) (citation omitted).  Here, the record does not support a finding that Petitioner's constitutional right to present a complete defense was infringed upon.  The proposed BWS evidence would not have provided a complete defense to murder.  Rather, its purpose was to explain why Petitioner continued to associate with Cunningham after the murder.  In any event, as more fully discussed above, trial counsel's decision not to proffer a BWS expert was a matter of trial strategy and falls far short of establishing that his legal representation was ineffective.  The California Supreme Court's rejection of this claim of judicial misconduct did not involve an unreasonable application of clearly established federal law.  Relief on this claim is DENIED.

### 4.   Denial of Post-Verdict Motion Relating to DNA Testing

Petitioner contends that the trial judge committed judicial misconduct by denying her post-conviction motion to pay for DNA testing.[54]  Resp't Ex. I at 96-98.  Petitioner alleges that no DNA tests were performed on physical evidence, such as hair, fibers and blood, found at the crime scene.  Id.  It is unclear what federal right Petitioner alleges was violated as a result of the apparent lack of such testing.  To the extent that Petitioner is alleging the denial of her right to a complete defense, there is no indication as to what the DNA evidence would have shown, let alone that such evidence would have exonerated her.  The California Supreme Court's rejection of this claim of judicial misconduct did not involve an unreasonable application of clearly established federal law.  Relief on this claim is DENIED.

### 5.   Marsden Motions

Petitioner contends that the trial court engaged in judicial misconduct by denying her first two Marsden motions to relieve trial counsel from representing her.  Resp't Ex. I at 100-101. The record shows that Petitioner made three Marsden motions:  one pre-verdict

---

[54] Petitioner phrases this claim in terms of the trial judge's abuse of discretion when she "den[ied] [the] post-conviction motion to appoint counsel for DNA testing . . . ." Resp't Ex. I at 96.  However, Petitioner does not raise such an issue in the supporting facts associated with her claim.  See id. at 96-98.  Therefore, the Court construes her claim to be alleged judicial misconduct for denying a post-conviction motion to fund DNA testing.

1  motion on April 3, 2002, and two post-verdict motions on April 17, 2002 and July 19,

2  2002.[55]  RT 2285-2301, RT 3056-3080, RT 3093-3111.  The trial court conducted hearings

3  on each Marsden motion, denied the first two motions, RT 2300, RT 3076, and granted the

4  final post-verdict motion, RT 3107-3110.  The trial court thereafter appointed Lawrence

5  Kaplan as Petitioner's new attorney.  Over a year later at a hearing conducted on August 8,

6  2003, the trial court denied Petitioner's Marsden motion to substitute Attorney Kaplan for

7  another attorney.  RT 3127.  Later, at that same hearing, the trial court granted Petitioner's

8  Faretta motion to proceed in pro per.  RT 3132; see also Dkt. 19-14 at 44.

9       In the instant matter, Petitioner does not challenge the trial court's handling of her

10  Marsden motions, but simply claims that she had a "huge conflict" with trial counsel.  See

11  Resp't Ex. I at 100-101 ("Veale did not have [my] best interest at heart, he played the role

12  as some attorneys do, Petitioner was a bargain[ing] chip [and] Veale intentionally threw the

13  case."); see also RT 2285-2301, RT 3056-3080, RT 3093-3111.  Since Petitioner does not

14  allege that the trial court mishandled her motions, the Court finds that the California

15  Supreme Court's rejection of her judicial misconduct claim was not objectively

16  unreasonable.  To the extent Petitioner is attempting to claim that her trial counsel was

17  ineffective, such a claim fails for the same reasons set forth above in this order in the

18  section addressing Petitioner's numerous IAC claims.  Relief on this claim is DENIED.

19            **6.      Extension of Time to File Motion for New Trial**

20       Petitioner contends that the trial court committed misconduct by denying her request

21  for an extension of time to file her motion for new trial.  Resp't Ex. I at 103-104.  The

22  matter of continuance falls within the discretion of the trial judge.  Ungar v. Sarafite, 376

23  U.S. 575, 589 (1964).  An abuse of discretion will be found only if "the denial was arbitrary

24  or unreasonable."  Armant v. Marquez, 772 F.2d 552, 556 (9th Cir. 1985) (internal

25  quotations and citation omitted).  Even if there was an abuse of discretion, habeas relief is

26  available only if the denial of a continuance resulted in actual prejudice to the petitioner.

27

28       _____
        [55] As mentioned above, the jury reached its verdict on April 10, 2002.  CT 920.

1    Id.; see Gallego v. McDaniel, 124 F.3d 1065, 1072 (9th Cir. 1997).  Here, Petitioner has

2    made no showing that the denial of her request for an extension was an abuse of discretion

3    or that she would have prevailed on her motion had the extension been granted.  Relief on

4    this claim is DENIED.

5                    **7.    Sufficiency of the Evidence**

6           Petitioner contends that the trial court committed judicial misconduct by upholding

7    her conviction (presumably by denying her motion for new trial) based on insufficient

8    evidence.  Resp't Ex. I at 106.  To obtain federal habeas relief, it must be shown that a state

9    court's rejection a sufficiency of the evidence claim was objectively unreasonable.

10   Cavazos v. Smith, 132 S.Ct. 2, 4 (2011).  The critical question is "whether the record

11   evidence could reasonably support a finding of guilt beyond a reasonable doubt."  Jackson

12   v. Virginia, 443 U.S. 307, 318 (1979).  Petitioner merely contends that the evidence at trial

13   was circumstantial and therefore insufficient to support a conviction for murder.  However,

14   the Ninth Circuit has held that "'[c]ircumstantial evidence and inferences drawn from it

15   may be sufficient to sustain a conviction.'"  Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir.

16   1995) (citation omitted).  Relief on this claim is DENIED.

17                   **8.    Denial of Request for Transcripts**

18          Petitioner faults Contra Costa County Superior Judges Theresa Canepa and Diana

19   Becton Smith by denying her two separate motions for access to transcripts of post-

20   conviction motions.  Resp't Ex. I at 108, 110.  The transcripts allegedly were necessary for

21   Petitioner to prepare her habeas petition.  Petitioner has not stated a prima facie case of a

22   constitutional violation.  The sine qua non of a right to transcripts is a need related to retrial

23   or appeal.  Britt v. North Carolina, 404 U.S. 226, 227 (1971); Griffin v. Illinois, 351 U.S.

24   12, 17-20 (1956)   Petitioner has failed to cite—and the Court is unaware of—any authority

25   holding that there is a clearly established federal right to transcripts for use in preparing a

26   habeas petition.  See Goldsberry v. Long, No. 2:13-CV-01358 AC, 2015 WL 3609350, at

27   *11 (E.D. Cal. June 8, 2015) ("Petitioner's difficulty in obtaining documents for his own

28

1    use in state habeas does not violate any clearly established constitutional right.").  Relief on

2    this claim is DENIED.

3                    **9.    Autopsy Photographs**

4           Petitioner contends that the trial court committed judicial misconduct by allowing

5    jurors to see the photos of the victim's autopsy "for [the] purpose of describing

6    dismemberment."  Resp't Ex. I at 112.  No showing has been made by Petitioner that the

7    admission of the photographs rendered her trial fundamentally unfair.  That aside, the

8    Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly

9    prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the

10   writ."  Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009).  Because the Supreme

11   Court has left this question unanswered, this Court cannot conclude that the state court

12   unreasonably applied clearly established federal law by admitting the autopsy photographs.

13   See Carey v. Musladin, 549 U.S. 70, 77 (2006) (where Supreme Court precedent gives no

14   clear answer to question presented, "it cannot be said that the state court 'unreasonab[ly]

15   appli[ed] clearly established Federal law'"); Gebrezgiabher v. Mike, No. C 06-7864 RMW,

16   2009 WL 2705931, *7 (N.D. Cal. Aug. 25, 2009) (denying habeas relief based on the

17   admission of autopsy photographs on the ground that there was no clearly established

18   federal law on point).  Relief on this claim is DENIED.

19                   **10.    Victim's Driver's License**

20          Petitioner contends that the trial court abused its discretion in allowing the jurors to

21   see the driver's license of the murder victim, Margaret, in order to show the jury her

22   weight.  Resp't Ex. I at 114.  She adds that both the prosecutor and a witness, Arnold

23   Josselson, "lied" by stating that Bernard was "never weighed."  Id.  The import of this

24   argument is entirely unclear.  To the extent that Petitioner is challenging the admission of

25   evidence, such claim fails to state claim for habeas relief.  See Holley, 568 F.3d at 1101.

26   Relief on this claim is DENIED.

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 11.    Jury Composition

Petitioner contends that the trial court committed judicial misconduct because: (1) there were eleven men and one woman on the jury; (2) all jurors were "upper middle class people"; (3) all jurors were familiar with Petitioner's case due to media exposure; (4) all had prior commitments, including non-refundable vacations; and that (5) each juror knew someone in law enforcement.  Resp't Ex. I at 116.  Petitioner does not allege that Judge Brady engaged in any particular misconduct in the jury selection process, however. To the extent that Petitioner is claiming juror bias or that her trial counsel was ineffective during the jury selection process, such claims have not been exhausted in the state courts. See Miller v. Fenton, 474 U.S. 104, 114-15 (1985) (a state trial judge is in a far superior position to assess juror bias than federal habeas judges); see also Austad v. Risley, 761 F.2d 1348, 1350 (9th Cir. 1985) ("The Supreme Court has clearly established that the determination of a juror's partiality or bias is a factual determination to which section 2254(d)'s presumption of correctness applies.").  Moreover, Petitioner points to no evidence in the record to suggest that the jury was biased or engaged in misconduct.  Relief on this claim is DENIED.

### C.    PROSECUTORIAL MISCONDUCT

Petitioner raises five claims of prosecutorial misconduct against the prosecutor, Dara Cashman.  See Resp't Ex. I at 117-130.  Federal habeas review of prosecutorial misconduct claims is limited to the narrow issue of whether the alleged misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  Darden v. Wainwright, 477 U.S. 168, 181 (1986); see also Smith v. Phillips, 455 U.S. 209, 219 (1982) ("[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor.").  Prosecutorial misconduct that rises to the level of a due process violation may provide grounds for granting a habeas petition only if that misconduct had a "substantial and injurious effect or influence in determining the jury's verdict."  Wood v. Ryan, 693 F.3d 1104, 1113 (9th Cir. 2012); see also Brecht v. Abrahamson, 507 U.S. 619, 637-38 (1993).  A petitioner is not entitled to

1    habeas corpus relief in the absence of a due process violation even if the prosecutor's

2    comments were "undesirable or even universally condemned."  Donnelly v. DeChristoforo,

3    416 U.S. 637, 642 (1974).

4                        **1.      Closing Argument**

5           Petitioner contends that the prosecutor committed misconduct by presenting a

6    "crucial element" of its theory for the first time in her closing argument.  Resp't Ex. I at

7    122.  In particular, she claims that "[t]he prosecution . . . was allowed to postpone any

8    statement of its theory regarding Cunningham's participation in the victim's death until the

9    defense had no opportunity to respond."  Id.  Petitioner does not, however, identify any

10   particular statement by the prosecution that she alleges amounts to misconduct.  See Tak

11   Sun Tan v. Runnels, 413 F.3d 1101, 1112 (9th Cir. 2005) ("[U]nder Darden, the first issue

12   is whether the prosecutor's remarks were improper and, if so, whether they infected the trial

13   with unfairness.").  Moreover, Petitioner's vague assertions of misconduct do not suffice to

14   show that the prosecutor's unspecified remarks had a substantial and injurious effect or

15   influence on the jury's verdict.  See Jones v. Gomez, 66 F.3d 199, 204 (9th Cir. 1995)

16   (vague and conclusory allegations of misconduct do not warrant habeas relief).[56]  Relief on

17   this claim is DENIED.

18                       **2.      Conflict of Interest**

19          Petitioner contends that the prosecutor committed misconduct by failing to recuse

20   herself from the case due to an alleged conflict of interest in that she had previously

21   prosecuted Cunningham in "felony possession cases," and that Cunningham had been

22   "ordered released by Judge Brady."  Resp't Ex. I at 124.  The prosecutor's prior

23   prosecution of Cunningham does not demonstrate a conflict of interest.  To the extent that

24   _____

25          [56] Even if Petitioner had sufficiently identified the objectionable statements by the
     prosecutor, her claim of prosecutorial misconduct is procedurally barred by virtue of her
26   failure to show that she made a timely objection at trial and requested a limiting instruction.
     See Rich v. Calderon, 187 F.3d 1064, 1070 (9th Cir. 1999) ("We may not review his six
27   other prosecutorial misconduct claims because [petitioner] procedurally defaulted by failing
     to make contemporaneous objections, and the California court consequently invoked a
28   procedural bar to their consideration, the validity of which Rich has failed to overcome").

                                                48

1    Petitioner takes issue with the prosecutor's decision to charge her and not Cunningham,

2    Petitioner has failed to present "exceptionally clear proof" to overcome the presumption

3    that the prosecutor's charging decision is lawful.  Nunes v. Ramirez-Palmer, 485 F.3d 432,

4    441 (9th Cir. 2007). Relief on this claim is DENIED.

### 3.    Comment on Cunningham's Relationship with Petitioner

6          Petitioner asserts that the prosecutor erred in stating that "Petitioner had no fear of

7    Cunningham whatsoever, that he was not stalking her, never threatened her life, and that he

8    loved her and [the prosecutor] showed [the] jury a romantic card dated 11-00 (for

9    Thanksgiving)."  Resp't Ex. I at 126.  Petitioner has not provided citations to the record to

10   support any of her aforementioned assertions.  Without specific claims and facts, a Court is

11   unable to determine whether Petitioner's constitutional rights were violated.  See Donnelly,

12   416 U.S. at 643.  On this basis alone, habeas relief may be denied.  Jones v. Gomez, 66

13   F.3d 199, 205 (9th Cir. 1995) (holding that relief on a habeas claim made "[w]ithout

14   reference to the record or any document" was properly denied).

15         The above notwithstanding, the Court's independent review of the record reveals

16   that Petitioner's allegations lack foundation.  The record shows that the prosecutor argued

17   that there were no witnesses to Cunningham's alleged stalking of Petitioner, and that the

18   evidence did not otherwise support Petitioner's claim that Cunningham was stalking her.

19   RT 2942-2946.  The prosecutor argued that while Cunningham's feelings for Petitioner

20   motivated him to help her dispose of the victim's body, any evidence that Cunningham

21   committed the murder (as opposed to being an accessory after the fact) was based on

22   Petitioner's testimony, and was not supported by any other evidence.  The prosecutor also

23   pointed out that Cunningham had an alibi based on Ms. Hardcastle's testimony.  RT 2946-

24   2955.  In view of the record presented, the California Supreme Court had an objectively

25   reasonable basis for rejecting Petitioner's claim of prosecutorial misconduct.  Relief on this

26   claim is DENIED.

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

#### 4.    Contact with Jurors

Petitioner contends that the prosecutor had "contact with jurors during trial . . . on more than one occasion," telling them she needed a conviction so she would have leverage to make Petitioner testify against Cunningham."  Resp't Ex. I at 128.  As support, Petitioner cites an "interview with Phillip Goff, juror #1," id., which consists of his handwritten notes of a telephone conversation Petitioner's trial counsel, Mr. Veale, allegedly had with juror Goff.  Dkt. 19-6 at 41-49.  Under the heading "After verdict," the notes state:  "D.A. Cashman said – I need a murder conviction to force K[endra Bernard] to cooperate – now I have leverage to cooperate."  Id. at 47.[57]

The quoted statement attributed to the prosecutor is insufficient to demonstrate prosecutorial misconduct.  The record does not indicate any details regarding the alleged conversation, such as the parties to or date and time of the conversation, or when or who created the notes.  There likewise is no proof, such as a declaration that Goff, in fact, made such statements, which, in any event, are double hearsay.  Evidentiary flaw aside, the prosecutor's alleged remarks appear to have been made post-verdict.  As such, they could not have had a substantial and injurious effect or influence in determining the jury's verdict.  Relief on this claim is DENIED.

#### 5.    Suppression of Statements by Terry and Alice George

Petitioner contends that the prosecutor improperly suppressed the statements by Terry George and his mother, Alice George, regarding Cunningham's whereabouts at the time of the murder.  Resp't Ex. I at 130.  As more fully discussed in the section above discussing Petitioner's IAC claims, Petitioner alleges that her trial counsel learned from his own investigation that both of these individuals had made statements that would have impeached Ms. Hardcastle's alibi for Cunningham.  However, Petitioner fails to point to anything in the record to establish that the prosecutor knew of those statements, let alone

---

[57] In the ECF version of this exhibit, the sentence is obscured by highlighting.  Dkt. 19-6 at 49.  The original hard-copy of the exhibit, however, is legible.   See Pet'r Ex. Z to Dkt. 19 at 9.

actively sought to exclude them.[58]  It was therefore for objectively reasonable for the California Supreme Court to reject this claim.  Relief on this claim is DENIED.

## D.   JUROR MISCONDUCT

Petitioner alleges two claims that the jurors committed misconduct.  Resp't Ex. I at 131-138.  The Sixth Amendment guarantees the criminally accused the right to a fair trial by a panel of impartial jurors.  U.S. Const. amend. VI; see Irvin v. Dowd, 366 U.S. 717, 722 (1961).  Due process requires that a criminal defendant be tried by "a jury capable and willing to decide the case solely on the evidence before it."  Smith v. Phillips, 455 U.S. 209, 217 (1982); Estrada v. Scribner, 512 F.3d 1227, 1238 (9th Cir. 2008).  Habeas relief is warranted, however, only where it is reasonably likely that the petitioner would have obtained a better outcome if the misconduct had not occurred.  See Brecht, 507 U.S. at 637 (constitutional trial errors do not warrant habeas relief unless they have substantial and injurious impact on the jury's verdict or trial proceedings); Lawson v. Borg, 60 F.3d 608, 612 (9th Cir. 1995) (applying Brecht to juror misconduct claim).

### 1.   Juror Complaint Regarding Jury Duty

Petitioner argues that a witness, Lee Ellison, overheard jurors complain that "they were mad that they got stuck on a murder beef," and that one of the jurors said "they [sic] had better stuff to do."  Resp't Ex. I at 136.  Petitioner has failed to cite any supporting evidence, such as a declaration of any juror or Mr. Ellison.  Although Petitioner references a supporting exhibit, she claims that such document has been "lost."  Id.  Standing alone, the lack of factual support for Petitioner's allegations is fatal to her juror misconduct claim. See James v. Borg, 24 F.3d 20, 26 (9th Cir.1994) ("Conclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief"); United States v. Smith, 924 F.2d 889, 896 (9th Cir. 1991) ("[U]nsupported and conclusory claims are not

---

[58] Petitioner also claims that the prosecutor incorrectly stated that Cunningham did not arrive at Petitioner's house until 7:30 p.m., after Bernard had been murdered.  Petitioner provides no citation for this assertion, which undermines this claim.  See Jones, 66 F.3d at 205.  She also fails to show that a 7:30 p.m. as opposed a 6:30 p.m. arrival time would have in any way affected the jury's verdict.

1   sufficient to show error.").  Even if supporting evidence was presented, no showing has

2   been made that the jury or were otherwise incapable of being fair and impartial or that their

3   alleged displeasure with serving on the jury had a substantial and injurious effect on their

4   verdict.  Relief on this claim is DENIED.

5                   **2.      Misconduct by Juror No. 1**

6         Petitioner contends that juror number 1, Phillip Goff, "ma[d]e up his mind" before

7   hearing the defense case.  Resp't Ex. I at 138.  A juror who prejudges a case before

8   considering all of the evidence violates his or her duty to decide the case solely on the

9   evidence presented.  See Davis v. Woodford, 384 F.3d 628, 653 (9th Cir. 2004) ("What is

10  crucial is . . . that each juror keep an open mind until the case has been submitted to the

11  jury.'") (citation omitted); Grobeson v. City of Los Angeles, 190 Cal.App.4th 778, 792

12  (2010) (noting that it is well established that "[f]or a juror to prejudge the case is serious

13  misconduct.") (internal quotation mark and citation).  A habeas petitioner "must allege facts

14  which, if proved, would show that the premature deliberations prejudiced him to the extent

15  that he did not receive a fair trial."  Belmontes v. Brown, 414 F.3d 1094, 1124-25 (9th Cir.

16  2005).

17        Here, Petitioner has not shown that juror Goff engaged in any misconduct.  The only

18  evidentiary support offered by Petitioner is the aforementioned handwritten notes of a post-

19  trial telephone conversation between defense attorney Veale and Mr. Goff.  Dkt. 19-6 at 41-

20  49.  Specifically, the notes indicate:  "Goff [juror number 1] made up his mind – GUILT,

21  but not 1 or 2 until Kendra testified."  Id. at 47.  Setting aside that the statement is double-

22  hearsay and lacks foundation, it is plainly incomplete and ambiguous.  At best, the notes

23  seem to relate to juror Goff's thought process, which may not be used to impeach a verdict.

24  See United States v. Bagnariol, 665 F.2d 877, 884-85 (9th Cir. 1981) ("Jurors may testify

25  regarding extraneous prejudicial information or improper outside influences.  They may not

26  be questioned about the deliberative process or subjective effects of extraneous

27  information, nor can such information be considered by the trial or appellate courts."); Cal.

28

1  Evid. Code § 1150(a) (a verdict may not be impeached by inquiry into the juror's mental or

2  subjective reasoning processes).  Relief on this claim is DENIED.

3  **IV.    CERTIFICATE OF APPEALABILITY**

4          No certificate of appealability is warranted in this case.  For the reasons set out

5  above, jurists of reason would not find this Court's denial of Petitioner's claims debatable

6  or wrong.  See Slack v. McDaniel, 529 U.S. 473, 484 (2000).  Petitioner may not appeal the

7  denial of a Certificate of Appealability in this Court but may seek a certificate from the

8  Ninth Circuit under Rule 22 of the Federal Rules of Appellate Procedure.  See Rule 11(a)

9  of the Rules Governing Section 2254 Cases.

10  **V.    CONCLUSION**

11         For the reasons stated above,

12              IT IS HEREBY ORDERED THAT:

13         1.    All claims from the Amended Petition are DENIED, and a certificate of

14  appealability will not issue.  Petitioner may seek a certificate of appealability from the

15  Ninth Circuit Court of Appeals.

16         2.    The Clerk shall enter judgment, terminate any pending matters, and close the

17  file.

18         IT IS SO ORDERED.

19  Dated:  July 22, 2016

    *Saundra B Armstrong*

20  SAUNDRA BROWN ARMSTRONG
    Senior United States District Judge

27  P:\PRO-SE\SBA\HC.07\Bernard1575.denyHC-final072216.docx

53